# CLEMENTS, GOVERNOR OF TEXAS, ET AL. *v.* FASHING ET AL.

No. 80–1290.   Argued January 12, 1982—Decided June 25, 1982

JUSTICE REHNQUIST delivered the opinion of the Court with respect to Parts I, II, and V, concluding that:

1. The uncontested allegations in the complaint are sufficient to create an actual case or controversy between the officeholder-appellees and those Texas officials charged with enforcing §§ 19 and 65.   Pp. 961–962.

2. Sections 19 and 65 do not violate the First Amendment.   The State's interests are sufficient to warrant the *de minimis* interference with appellees' First Amendment interests in candidacy.   In addition,

appellees' First Amendment challenge as *elected* state officeholders contesting restrictions on partisan political activity must fail since §§ 19 and 65 represent a far more limited restriction on political activity than has been upheld with regard to *civil servants.* Cf. *CSC* v. *Letter Carriers,* 413 U. S. 548; *Broadrick* v. *Oklahoma,* 413 U. S. 601; *United Public Workers* v. *Mitchell,* 330 U. S. 75. Pp. 971–973.

JUSTICE REHNQUIST, joined by THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE O'CONNOR, concluded in Parts III and IV that neither of the challenged provisions of the Texas Constitution violates the Equal Protection Clause. Pp. 962–971.

(a) Candidacy is not a "fundamental right" that itself requires departure from traditional equal protection principles under which state-law classifications need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions. In determining whether the provisions challenged here deserve "scrutiny" more vigorous than that which the traditional principles would require, the nature of the interests affected and the extent of the burden the challenged provisions place on the candidacy of current officeholders must be examined. Pp. 962–966.

(b) As applied to Baca, a Justice of the Peace whose term of office is four years whereas a state legislator's term is two years, § 19 simply requires that Baca must wait, at most, two years—one election cycle—before he may run as a candidate for the legislature. In establishing this maximum "waiting period," § 19 places a *de minimis* burden on the political aspirations of a current officeholder. This sort of insignificant interference with access to the ballot need only rest on a rational predicate in order to survive an equal protection challenge. Section 19 clearly rests on a rational predicate, since it furthers Texas' interests in maintaining the integrity of its Justices of the Peace by ensuring that they will neither abuse their position nor neglect their duties because of aspirations for higher office. Moreover, Texas has a legitimate interest in discouraging its Justices of the Peace from vacating their current terms of office, thereby avoiding the difficulties that accompany interim elections and appointments. Nor is § 19 invalid in that it burdens only those officeholders who desire to run for the legislature. It would be a perversion of the Equal Protection Clause to conclude that Texas must restrict a Justice of the Peace's candidacy for *all* offices before it can restrict his candidacy for *any* office. Pp. 966–970.

(c) The burdens imposed on candidacy by the automatic-resignation provision of § 65 are even less substantial than those imposed by § 19. Both provisions serve essentially the same state interests. Nor is § 65 invalid on the ground that it applies only to certain elected officials and not to others. Its history shows that the resignation provision was a creature of state electoral reforms, and a regulation is not devoid of a rational predicate simply because it happens to be incomplete. The Equal Protection Clause does not prohibit Texas from restricting one elected officeholder's candidacy for another elected office unless and until it places similar restrictions on other officeholders. Pp. 970–971.

REHNQUIST, J., announced the Court's judgment and delivered the opinion of the Court with respect to Parts I, II, and V, in which BURGER, C. J., and POWELL, STEVENS, and O'CONNOR, JJ., joined, and an opinion with respect to Parts III and IV, in which BURGER, C. J., and POWELL and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, post, p. 973. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, and in Part I of which WHITE, J., joined, post, p. 976.

*James P. Allison*, Assistant Attorney General of Texas, argued the cause for appellants. With him on the brief were *Mark White*, Attorney General, *John W. Fainter, Jr.*, First Assistant Attorney General, and *Richard E. Gray III*, Executive Assistant Attorney General.

*Raymond C. Caballero* argued the cause for appellees. With him on the brief was *John L. Fashing, pro se.**

JUSTICE REHNQUIST delivered the opinion of the Court with respect to Parts I, II, and V, and delivered an opinion with respect to Parts III and IV, in which THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE O'CONNOR joined.

Appellees in this case challenge two provisions of the Texas Constitution that limit a public official's ability to become a candidate for another public office. The primary question in this appeal is whether these provisions violate the Equal Protection Clause of the Fourteenth Amendment.

---

*Gary A. Ahrens* filed a brief for the County Court at Law Judges Association of the State of Texas as *amicus curiae* urging affirmance.

## I

Article III, § 19, of the Texas Constitution provides:

> "No judge of any court, Secretary of State, Attorney General, clerk of any court of record, or any person holding a lucrative office under the United States, or this State, or any foreign government shall during the term for which he is elected or appointed, be eligible to the Legislature."

Section 19 renders an officeholder ineligible for the Texas Legislature if his current term of office will not expire until after the legislative term to which he aspires begins. *Lee* v. *Daniels*, 377 S. W. 2d 618, 619 (Tex. 1964). Resignation is ineffective to avoid § 19 if the officeholder's current term of office overlaps the term of the legislature to which he seeks election. *Ibid.* In other words, § 19 requires an officeholder to complete his current term of office before he may be eligible to serve in the legislature.

Article XVI, § 65, is commonly referred to as a "resign-to-run" or "automatic resignation" provision. Section 65 covers a wide range of state and county offices.[1] It provides in relevant part:

> "[I]f any of the officers named herein shall announce their candidacy, or shall in fact become a candidate, in any General, Special or Primary Election, for any office of profit or trust under the laws of this State or the United States other than the office then held, at any time when the unexpired term of the office then held shall exceed one (1) year, such announcement or such candidacy shall constitute an automatic resignation of the office then held."

---

[1] Section 65 covers District Clerks, County Clerks, County Judges, County Treasurers, Criminal District Attorneys, County Surveyors, Inspectors of Hides and Animals, County Commissioners, Justices of the Peace, Sheriffs, Assessors and Collectors of Taxes, District Attorneys, County Attorneys, Public Weighers, and Constables. Section 65 altered the terms of these offices. See *infra*, at 970.

Four of the appellees are officeholders subject to the automatic resignation provision of § 65. Fashing is a County Judge, Baca and McGhee are Justices of the Peace, and Ybarra is a Constable. Each officeholder-appellee alleged in the complaint that he is qualified under Texas law to be a candidate for higher judicial office, and that the reason he has not and will not announce his candidacy is that such an announcement will constitute an automatic resignation from his current position. Appellee Baca alleged in addition that he could not become a candidate for the legislature because of § 19. The remaining appellees are 20 voters who allege that they would vote for the officeholder-appellees were they to become candidates.

The District Court for the Western District of Texas held that § 19 and § 65 denied appellees equal protection. *Fashing* v. *Moore*, 489 F. Supp. 471 (1980). The District Court concluded that § 19 created "classifications that are invidiously discriminatory." *Id.*, at 475. The District Court explained that § 19 draws distinctions between those officials whose terms end concurrently with the beginning of the legislative term and those whose terms overlap the legislative term. The court also found § 19 deficient because "[n]o reciprocal prohibition . . . is placed upon a legislator seeking to run for mayor or judge." *Ibid.* As to § 65, the District Court determined that the classifications embodied in § 65 "fail[ed] to serve any proper governmental interest" because some state and local officials were covered by § 65 while others were not. The Court of Appeals for the Fifth Circuit affirmed without opinion. *Fashing* v. *Moore*, 631 F. 2d 731 (1980). We noted probable jurisdiction, 452 U. S. 904 (1981), and now reverse.

## II

Before we may reach the merits of the constitutional issues in this case, we must address appellants' contention that the allegations in the complaint are insufficient to create a "case or controversy" between the officeholder-appellees and those Texas officials charged with enforcing § 19 and § 65. Appel-

lants contend that the dispute in this case is merely hypothetical and therefore not a justiciable controversy within the meaning of Art. III of the United States Constitution. *United Public Workers* v. *Mitchell,* 330 U. S. 75, 90–91 (1947).

We find the uncontested allegations in the complaint sufficient to create an actual case or controversy. The officeholder-appellees have alleged that they have not and will not announce their candidacy for higher judicial office because such action will constitute an automatic resignation of their current offices pursuant to § 65. Unlike the situation in *Mitchell,* appellees have alleged in a precise manner that, but for the sanctions of the constitutional provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision. Given that § 65 provides for *automatic* resignation upon an announcement of candidacy, it cannot be said that § 65 presents only a speculative or hypothetical obstacle to appellees' candidacy for higher judicial office. See *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 143, and n. 29 (1974); *Turner* v. *Fouche,* 396 U. S. 346, 361–362, n. 23 (1970).

Baca's uncontested allegations are sufficient to create a case or controversy with regard to § 19. That provision entirely disables an officeholder from becoming a candidate for the legislature until he completes his present term of office. The gist of Baca's challenge to § 19 is that it renders him ineligible to become a candidate for the legislature because his term as Justice of the Peace overlaps the legislative term. Baca's dispute with appellants over the constitutionality of § 19, therefore, cannot be said to be abstract or hypothetical, since he has sufficiently alleged that § 19 has prevented him from becoming a candidate for the legislature.

### III

The Equal Protection Clause allows the States considerable leeway to enact legislation that may appear to affect

similarly situated people differently. Legislatures are ordinarily assumed to have acted constitutionally. Under traditional equal protection principles, distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them. See, *e. g., McDonald* v. *Board of Election Comm'rs,* 394 U. S. 802, 808–809 (1969); *McGowan* v. *Maryland,* 366 U. S. 420, 425–426 (1961). We have departed from traditional equal protection principles only when the challenged statute places burdens upon "suspect classes" of persons or on a constitutional right that is deemed to be "fundamental." *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 17 (1973).

Thus, we must first determine whether the provisions challenged in this case deserve "scrutiny" more vigorous than that which the traditional principles would require.

Far from recognizing candidacy as a "fundamental right," we have held that the existence of barriers to a candidate's access to the ballot "does not of itself compel close scrutiny." *Bullock* v. *Carter,* 405 U. S. 134, 143 (1972). "In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Ibid.* In assessing challenges to state election laws that restrict access to the ballot, this Court has not formulated a "litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause." *Storer* v. *Brown,* 415 U. S. 724, 730 (1974). Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions. *Ibid.; Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968).

Our ballot access cases, however, do focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the "availability of political opportunity." *Lubin* v. *Panish*, 415 U. S. 709, 716 (1974). This Court has departed from traditional equal protection analysis in recent years in two essentially separate, although similar, lines of ballot access cases.

One line of ballot access cases involves classifications based on wealth.[2] In invalidating candidate filing-fee provisions, for example, we have departed from traditional equal protection analysis because such a "system falls with unequal weight on voters, as well as candidates, according to their economic status." *Bullock* v. *Carter, supra*, at 144. "Whatever may be the political mood at any given time, our tradition has been one of hospitality toward all candidates without regard to their economic status." *Lubin* v. *Panish, supra*, at 717–718. Economic status is not a measure of a prospective candidate's qualifications to hold elective office, and a filing fee alone is an inadequate test of whether a candidacy is serious or spurious. Clearly, the challenged provisions in the instant case involve neither filing fees nor restrictions that invidiously burden those of lower economic status. This line of cases, therefore, does not support a departure from the traditional equal protection principles.

The second line of ballot access cases involves classification schemes that impose burdens on new or small political parties or independent candidates. See, *e. g., Illinois State Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173 (1979); *Storer* v. *Brown, supra; American Party of Texas* v. *White*, 415 U. S. 767 (1974); *Jenness* v. *Fortson*, 403 U. S. 431 (1971); *Williams* v. *Rhodes, supra*. These cases involve requirements

---

[2] *Bullock* v. *Carter*, 405 U. S. 134 (1972); *Lubin* v. *Panish*, 415 U. S. 709 (1974).

that an independent candidate or minor party demonstrate a certain level of support among the electorate before the minor party or candidate may obtain a place on the ballot. In these cases, the Court has emphasized that the States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections. To this end, the Court has upheld reasonable level-of-support requirements and classifications that turn on the political party's success in prior elections. See *Storer* v. *Brown, supra; American Party of Texas* v. *White, supra; Jenness* v. *Fortson, supra.* The Court has recognized, however, that such requirements may burden First Amendment interests in ensuring freedom of association, as these requirements classify on the basis of a candidate's association with particular political parties. Consequently, the State may not act to maintain the "status quo" by making it virtually impossible for any but the two major parties to achieve ballot positions for their candidates. See *Williams* v. *Rhodes, supra,* at 25.

The provisions of the Texas Constitution challenged in this case do not contain any classification that imposes special burdens on minority political parties or independent candidates. The burdens placed on those candidates subject to § 19 and § 65 in no way depend upon political affiliation or political viewpoint.

It does not automatically follow, of course, that we must apply traditional equal protection principles in examining § 19 and § 65 merely because these restrictions on candidacy do not fall into the two patterns just described. But this fact does counsel against discarding traditional principles without first examining the nature of the interests that are affected and the extent of the burden these provisions place on candidacy. See *Bullock* v. *Carter, supra,* at 143; *Storer* v. *Brown, supra,* at 730. Not all ballot access restrictions

require "heightened" equal protection scrutiny. The Court, for example, applied traditional equal protection principles to uphold a classification scheme that denied absentee ballots to inmates in jail awaiting trial. *McDonald* v. *Board of Election Comm'rs*, 394 U. S., at 807–811. Thus, it is necessary to examine the provisions in question in terms of the extent of the burdens that they place on the candidacy of current holders of public office.

## IV

### A

Section 19 applies only to candidacy for the Texas Legislature. Of the appellees, only Baca, a Justice of the Peace, alleged that he would run for the Texas Legislature. Of the plaintiffs in this case, only appellee Baca's candidacy for another public office has in any fashion been restricted by § 19. The issue in this case, therefore, is whether § 19 may be applied to a Justice of the Peace in a manner consistent with the Equal Protection Clause.[3]

Section 19 merely prohibits officeholders from cutting short their current term of office in order to serve in the legislature. In Texas, the term of office for a Justice of the Peace is four years, while legislative elections are held every

---

[3] A litigant has standing to challenge the constitutionality of a statute only insofar as it adversely affects his own rights. *Ulster County Court* v. *Allen*, 442 U. S. 140, 154–155 (1979). "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 610 (1973). Therefore, Baca may not argue that § 19 may not be applied to restrict a Justice of the Peace's candidacy for the legislature because the State's interests in restricting candidacy by a different class of officeholders are insufficient to survive constitutional scrutiny. See *Storer* v. *Brown*, 415 U. S. 724, 737 (1974). Cf. *Cabell* v. *Chavez-Salido*, 454 U. S. 432, 442 (1982).

two years.   See Tex. Const., Art. V, § 18; Art. III, §§ 3, 4. Therefore, § 19 simply requires Baca to complete his 4-year term as Justice of the Peace before he may be eligible for the legislature.   At most, therefore, Baca must wait two years— one election cycle—before he may run as a candidate for the legislature.[4]

In making an equal protection challenge, it is the claimant's burden to "demonstrate in the first instance a discrimination against [him] of some substance." *American Party of Texas* v. *White,* 415 U. S., at 781.   Classification is the essence of all legislation, and only those classifications which are invidious, arbitrary, or irrational offend the Equal Protection Clause of the Constitution.   *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955).

In establishing a maximum "waiting period" of two years for candidacy by a Justice of the Peace for the legislature, § 19 places a *de minimis* burden on the political aspirations of a *current* officeholder.   Section 19 discriminates neither on the basis of political affiliation nor on any factor not related to a candidate's qualifications to hold political office.   Unlike filing fees or the level-of-support requirements, § 19 in no way burdens access to the political process by those who are outside the "mainstream" of political life.   In this case, § 19 burdens only a candidate who has successfully been elected to one office, but whose political ambitions lead him to pursue a seat in the Texas Legislature.

A "waiting period" is hardly a significant barrier to candidacy.   In *Storer* v. *Brown,* 415 U. S., at 733–737, we upheld a statute that imposed a flat disqualification upon any candidate seeking to run in a party primary if he had been registered or affiliated with another political party within the 12 months preceding his declaration of candidacy.   Similarly, we upheld a 7-year durational residency requirement for can-

---

[4] In the case of local elected officials whose terms of office typically end in nonelection years, the "waiting period" of § 19 is even shorter.

didacy in *Chimento* v. *Stark*, 414 U. S. 802 (1973), summarily aff'g 353 F. Supp. 1211 (NH). We conclude that this sort of insignificant interference with access to the ballot need only rest on a rational predicate in order to survive a challenge under the Equal Protection Clause. See *Illinois State Bd. of Elections* v. *Socialist Workers Party*, 440 U. S., at 189 (STEVENS, J., concurring in part and in judgment).

Section 19 clearly rests on a rational predicate. That provision furthers Texas' interests in maintaining the integrity of the State's Justices of the Peace.[5] By prohibiting candidacy for the legislature until completion of one's term of office, § 19 seeks to ensure that a Justice of the Peace will neither abuse his position nor neglect his duties because of his aspirations for higher office. The demands of a political campaign may tempt a Justice of the Peace to devote less than his full time and energies to the responsibilities of his office. A campaigning Justice of the Peace might be tempted to render decisions and take actions that might serve more to further his political ambitions than the responsibilities of his office. The State's interests are especially important with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision. By contrast, it is to be expected that a legislator will vote with due regard to the views of his constituents.

Texas has a legitimate interest in discouraging its Justices of the Peace from vacating their current terms of office. By requiring Justices of the Peace to complete their current terms of office, the State has eliminated one incentive to vacate one's office prior to the expiration of the term. The State may act to avoid the difficulties that accompany interim elections and appointments. "[T]he Constitution does not require the State to choose ineffectual means to achieve its

---

[5] The State's particular interest in maintaining the integrity of the judicial system could support § 19, even if such a restriction could not survive constitutional scrutiny with regard to any other officeholder. See n. 3, *supra.*

aims." *Storer* v. *Brown, supra*, at 736. Under traditional equal protection principles, a classification is not deficient simply because the State could have selected another means of achieving the desired ends. *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 316 (1976); *Mathews* v. *Diaz*, 426 U. S. 67, 83 (1976); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S., at 51.

Finally, it is no argument that § 19 is invalid because it burdens only those officeholders who desire to run for the legislature. In *Broadrick* v. *Oklahoma*, 413 U. S. 601, 607, n. 5 (1973), we rejected the contention that Oklahoma's restrictions on political activity by public employees violated the Equal Protection Clause:

> "Appellants also claim that § 818 violates the Equal Protection Clause of the Fourteenth Amendment by singling out classified service employees for restrictions on partisan political expression while leaving unclassified personnel free from such restrictions. The contention is somewhat odd in the context of appellants' principal claim, which is that § 818 reaches too far rather than not far enough. In any event, the legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated. See *McGowan* v. *Maryland*, 366 U. S. 420 (1961). And a State can hardly be faulted for attempting to limit the positions upon which such restrictions are placed."

It would indeed be a perversion of the Equal Protection Clause were we to conclude that Texas must restrict a Justice of the Peace's candidacy for *all* offices before it can restrict a Justice of the Peace's candidacy for *any* office.

The Equal Protection Clause allows the State to regulate "one step at a time, addressing itself to the phase of the problem which seems most acute." *Williamson* v. *Lee Optical Co.*, 348 U. S., at 489. The State "need not run the risk

of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." *McDonald* v. *Board of Election Comm'rs,* 394 U. S., at 809 (citation omitted).

B

Article XVI, § 65, of the Texas Constitution provides that the holders of certain offices automatically resign their positions if they become candidates for any other elected office, unless the unexpired portion of the current term is one year or less. The burdens that § 65 imposes on candidacy are even less substantial than those imposed by § 19. The two provisions, of course, serve essentially the same state interests. The District Court found § 65 deficient, however, not because of the nature or extent of the provision's restriction on candidacy, but because of the manner in which the offices are classified. According to the District Court, the classification system cannot survive equal protection scrutiny because Texas has failed to explain sufficiently why some elected public officials are subject to § 65 and why others are not. As with the case of § 19, we conclude that § 65 survives a challenge under the Equal Protection Clause unless appellees can show that there is no rational predicate to the classification scheme.

The history behind § 65 shows that it may be upheld consistent with the "one step at a time" approach that this Court has undertaken with regard to state regulation not subject to more vigorous scrutiny than that sanctioned by the traditional principles. Section 65 was enacted in 1954 as a transitional provision applying only to the 1954 election. 2 G. Braden, The Constitution of the State of Texas: An Annotated and Comparative Analysis 812 (1977). Section 65 extended the terms of those offices enumerated in the provision from two to four years. The provision also staggered the terms of other offices so that at least some county and local offices would be contested at each election. *Ibid.* The auto-

matic resignation proviso to § 65 was not added until 1958. In that year, a similar automatic resignation provision was added in Art. XI, § 11, which applies to officeholders in home rule cities who serve terms longer than two years. Section 11 allows home rule cities the option of extending the terms of municipal offices from two to up to four years.

Thus, the automatic resignation provision in Texas is a creature of the State's electoral reforms of 1958. That the State did not go further in applying the automatic resignation provision to those officeholders whose terms were not extended by § 11 or § 65, absent an invidious purpose, is not the sort of malfunctioning of the State's lawmaking process forbidden by the Equal Protection Clause. See *McDonald* v. *Board of Election Comm'rs, supra,* at 809. A regulation is not devoid of a rational predicate simply because it happens to be incomplete. See *Williamson* v. *Lee Optical Co., supra,* at 489. The Equal Protection Clause does not forbid Texas to restrict one elected officeholder's candidacy for another elected office unless and until it places similar restrictions on other officeholders. *Broadrick* v. *Oklahoma,* 413 U. S., at 607, n. 5. Cf. *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 466 (1981). The provision's language and its history belie any notion that § 65 serves the invidious purpose of denying access to the political process to identifiable classes of potential candidates.

## V

As an alternative ground to support the judgments of the courts below, appellees contend that § 19 and § 65 violate the First Amendment. Our analysis of appellees' challenge under the Equal Protection Clause disposes of this argument. We have concluded that the burden on appellees' First Amendment interests in candidacy are so insignificant that the classifications of § 19 and § 65 may be upheld consistent with traditional equal protection principles. The State's interests in this regard are sufficient to warrant the *de*

*minimis* interference with appellees' interests in candidacy.[6]

There is another reason why appellees' First Amendment challenge must fail. Appellees are *elected* state officeholders who contest restrictions on partisan political activity. Section 19 and § 65 represent a far more limited restriction on political activity than this Court has upheld with regard to *civil servants*. See *CSC* v. *Letter Carriers*, 413 U. S. 548 (1973); *Broadrick* v. *Oklahoma, supra; United Public Workers* v. *Mitchell*, 330 U. S. 75 (1947). These provisions in no way restrict appellees' ability to participate in the political campaigns of third parties. They limit neither political contributions nor expenditures. They do not preclude appellees from holding an office in a political party. Consistent with § 19 and § 65, appellees may distribute campaign literature and may make speeches on behalf of a candidate.

In this case, § 19 operates merely to require appellee Baca to await the conclusion of his 4-year term as Justice of the Peace before he may run for the Texas Legislature. By virtue of § 65, appellees in this case will automatically resign their current offices if they announce their candidacy for higher judicial office so long as the unexpired term of their current office exceeds one year. In this sense, § 19 and § 65 are in reality no different than the provisions we upheld in *Mitchell, Letter Carriers,* and *Broadrick*, which required dismissal of any civil servant who became a political candidate. See 413 U. S., at 556; 413 U. S., at 617.

Neither the Equal Protection Clause nor the First Amendment authorizes this Court to review in cases such as this the manner in which a State has decided to govern itself. Constitutional limitations arise only if the classification scheme is

---

[6] Baca may not utilize the "overbreadth" doctrine to challenge § 19. Baca may not challenge the provision's application to him on the grounds that the provision might be unconstitutional as applied to a class of officeholders not before the Court. *Broadrick* v. *Oklahoma*, 413 U. S., at 612–616. The First Amendment will not suffer if the constitutionality of § 19 is litigated on a case-by-case basis.

invidious or if the challenged provision significantly impairs interests protected by the First Amendment. Our view of the wisdom of a state constitutional provision may not color our task of constitutional adjudication.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

In cases presenting issues under the Equal Protection Clause, the Court often plunges directly into a discussion of the "level of scrutiny" that will be used to review state action that affects different classes of persons differently. Unfortunately that analysis may do more to obfuscate than to clarify the inquiry. This case suggests that a better starting point may be a careful identification of the character of the federal interest in equality that is implicated by the State's discriminatory classification. In my opinion, the disparate treatment in this case is not inconsistent with any federal interest that is protected by the Equal Protection Clause. With respect to the state action at issue, there is no federal requirement that the different classes be treated as though they were the same.

It is first helpful to put to one side the claim that the burdens imposed on certain Texas officeholders are inconsistent with the First Amendment. I am satisfied that the State's interest in having its officeholders faithfully perform the public responsibilities they have voluntarily undertaken is adequate to justify the restrictions placed on their ability to run for other offices. Nor is the First Amendment violated by the fact that the restrictions do not apply equally to all offices; while that Amendment requires a State's treatment of speech to be evenhanded, there is no suggestion here that the State's classification of offices operates to promote a certain viewpoint at the expense of another. The federal constitutional inquiry thus is limited to the question whether the

State's classification offends any interest in equality that is protected by the Equal Protection Clause.

In considering that question, certain preliminary observations are important. The complaining officeholders do not object to the fact that they are treated differently from members of the general public.[1] The only complaint is that certain officeholders are treated differently from other officeholders. Moreover, appellees do not claim that the classes are treated differently because of any characteristic of the persons who happen to occupy the various offices at any particular time or of the persons whom those officeholders serve; there is no suggestion that the attributes of the offices have been defined to conceal an intent to discriminate on the basis of personal characteristics or to provide governmental services of differing quality to different segments of the community. In this case, the disparate treatment of different officeholders is entirely a function of the different offices that they occupy.

The question presented then is whether there is any federal interest in requiring a State to define the benefits and burdens of different elective state offices in any particular manner. In my opinion there is not. As far as the Equal Protection Clause is concerned, a State may decide to pay a justice of the peace a higher salary than a Supreme Court justice. It may require game wardens to work longer hours than park rangers. It may require meat inspectors to wear uniforms without requiring building inspectors to do so. In addition, I see no reason why a State may not provide that certain offices will be filled on a part-time basis and that others will be filled by persons who may not seek other office until they have fulfilled their duties in the first. There may be no explanation for these classifications that a federal judge

---

[1] The fact that appellees hold state office is sufficient to justify a restriction on their ability to run for other office that is not imposed on the public generally.

would find to be "rational." But they do not violate the Equal Protection Clause because there is no federal requirement that a State fit the emoluments or the burdens of different elective state offices into any particular pattern.[2] The reason, then, that appellees may be treated differently from other officeholders is that they occupy different offices. Cf. *Illinois State Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 189 (STEVENS, J., concurring in part and in judgment).[3]

As in so many areas of the law, it is important to consider each case individually. In the situation presented, however, I believe that there is no federal interest in equality that requires the State of Texas to treat the different classes as though they were the same.[4] This reasoning brings me to the same conclusion that JUSTICE REHNQUIST has reached. It avoids, however, the danger of confusing two quite differ-

---

[2] The Federal Constitution does, of course, impose significant constraints on a state government's employment practices. For example, the First Amendment limits the State's power to discharge employees who make controversial speeches. *Pickering* v. *Board of Education*, 391 U. S. 563. The Due Process Clause affords procedural safeguards to tenured employees. *Board of Regents* v. *Roth*, 408 U. S. 564. The Equal Protection Clause prohibits the State from classifying applicants for employment in an arbitrary manner. *Sugarman* v. *Dougall*, 413 U. S. 634. I find no comparable federal interest, however, in this case.

[3] In *Vance* v. *Bradley*, 440 U. S. 93, the Court held that a statutory classification that treated employees of the Foreign Service differently from employees of the Civil Service did not violate the equal protection component of the Due Process Clause of the Fifth Amendment. In my view, such a classification—without more—could not violate equal protection requirements.

[4] In defining the interests in equality protected by the Equal Protection Clause, one cannot ignore the State's legitimate interest in structuring its own form of government. The Equal Protection Clause certainly was not intended to require the States to justify every decision concerning the terms and conditions of state employment according to some federal standard.

ent questions.[5]  JUSTICE REHNQUIST has demonstrated that there is a "rational basis" for imposing the burdens at issue on the offices covered by §§ 19 and 65.  He has not, however, adequately explained the reasons, if any, for imposing those burdens on some offices but not others.  With respect to the latter inquiry, the plurality is satisfied to note that the State may approach its goals "one step at a time."  *Ante,* at 969, 970.  In my judgment, this response is simply another way of stating that there need be no justification at all for treating two classes differently during the interval between the first step and the second step—an interval that, of course, may well last forever.  Although such an approach is unobjectionable in a case involving the differences between different public offices, I surely could not subscribe to JUSTICE REHNQUIST's formulation of the standard to be used in evaluating state legislation that treats different classes of persons differently.[6]  Accordingly, while I join the Court's judgment, I join only Parts I, II, and V of JUSTICE REHNQUIST's opinion.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, and with whom JUSTICE WHITE joins as to Part I, dissenting.

In rejecting appellees' equal protection challenge on the basis that the State is proceeding "one step at a time," the plurality today gives new meaning to the term "legal fic-

---

[5] See Westen, The Empty Idea of Equality, 95 Harv. L. Rev. 537 (1982). Professor Westen's article is valuable because it illustrates the distinction between concern with the substantive import of a state restriction and concern with any disparate impact that it may produce.  In recognizing that distinction, however, it is important not to lose sight of the fact that the Equal Protection Clause has independent significance in protecting the federal interest in requiring States to govern impartially.

[6] The plurality frames the test that should ordinarily be applied in this way: "Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them." *Ante,* at 963.

tion."[1]   The Court's summary dismissal of appellees' First Amendment claim vastly oversimplifies the delicate accommodations that must be made between the interests of the State as employer and the constitutionally protected rights of state employees.   I dissent.

# I

Putting to one side the question of the proper level of equal protection scrutiny to be applied to these restrictions on candidacy for public office,[2] I find it clear that no genuine justifi-

---

[1] I note that a majority of the Court today rejects the plurality's mode of equal protection analysis.   See *ante,* at 976 (STEVENS, J., concurring in part and in judgment).

[2] It is worth noting, however, that the plurality's analysis of the level of scrutiny to be applied to these restrictions gives too little consideration to the impact of our prior cases.   Although we have never defined candidacy as a fundamental right, we have clearly recognized that restrictions on candidacy impinge on First Amendment rights of candidates and voters.   See, *e. g., Illinois State Bd. of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 184 (1979); *Lubin* v. *Panish,* 415 U. S. 709, 716 (1974); *American Party of Texas* v. *White,* 415 U. S. 767 (1974); *Bullock* v. *Carter,* 405 U. S. 134, 142–143 (1972); *Williams* v. *Rhodes,* 393 U. S. 23, 31 (1968).   With this consideration in mind, we have applied strict scrutiny in reviewing most restrictions on ballot access; thus we have required the State to justify any discrimination with respect to candidacy with a showing that the differential treatment is "necessary to further compelling state interests."   *American Party of Texas* v. *White, supra,* at 780.   See also *Bullock* v. *Carter, supra,* at 144.   The plurality dismisses our prior cases as dealing with only two kinds of ballot access restrictions—classifications based on wealth and classifications imposing burdens on new or small political parties or independent candidates.   *Ante,* at 964–965.   But strict scrutiny was required in those cases because of their impact on the First Amendment *rights* of candidates and voters, see *Storer* v. *Brown,* 415 U. S. 724, 729 (1974), not because the *class* of candidates or voters that was burdened was somehow suspect.   Compare *Lubin* v. *Panish,* 415 U. S., at 717–718, with *id.,* at 719 (Douglas, J., concurring) (strict scrutiny demanded because classification based on wealth).   The plurality offers no explanation as to why the restrictions at issue here, which completely bar some candidates from running and require other candidates to give up their present employment, are

cation exists that might support the classifications embodied in either Art. III, § 19, or Art. XVI, § 65.

The State seeks to justify both provisions on the basis of its interest in discouraging abuse of office and neglect of duties by current officeholders campaigning for higher office during their terms. The plurality posits an additional justification not asserted by the State for § 19: That section also discourages certain officeholders "from vacating their current terms of office." *Ante*, at 968. But neither the State nor the plurality offers any justification for *differential* treatment of various classes of officeholders, and the search for such justification makes clear that the classifications embodied in these provisions lack any meaningful relationship to the State's asserted or supposed interests.

Article III, § 19, provides:

> "No judge of any court, Secretary of State, Attorney General, clerk of any court of record, or any person holding a lucrative office under the United States, or this state, or any foreign government shall during the term for which he is elected or appointed, be eligible to the Legislature."

And the Texas Election Code provides that persons ineligible to hold an office shall not be permitted to campaign for that office. Tex. Rev. Civ. Stat. Ann., Arts. 1.05, 1.06 (Vernon Supp. 1982). Article III, § 19, creates, in effect, two classes of officeholders. Officeholders of state, federal, and even foreign offices seeking Texas *legislative* office whose terms overlap with the legislative term are barred from campaign-

---

less "substantial" in their impact on candidates and their supporters than, for example, the $700 filing fee at issue in *Lubin.*

In my view, some greater deference may be due the State because these restrictions affect only public employees, see Part II, *infra,* but this does not suggest that, in subjecting these classifications to equal protection scrutiny, we should completely disregard the vital interests of the candidates and the citizens who they represent in a political campaign.

ing during their terms, and even after they have resigned, see n. 4, *infra;* those officeholders seeking any other office and those officeholders whose terms do not overlap the legislative term are free to launch campaigns from their current offices, even while they still hold office.

What relationship does the plurality find between the burden placed on the class of all state, federal, and foreign officeholders seeking legislative seats and the asserted state interests? If it faced the question, the plurality would of course have to acknowledge that Texas has no interest in protecting, for example, federal officials—particularly those serving the electorate of another State—from the corrupting influence of a state legislative campaign. The only conceivable state interest in barring these candidacies would be the purely impermissible one of protecting Texas legislative seats against outside competition. But the plurality does not address this question or purport to find any justification for the broad reach of § 19. Instead it defines the equal protection challenge to § 19 as "whether § 19 may be applied to a [Texas] Justice of the Peace," *ante,* at 966, and acknowledges that § 19 would not necessarily survive constitutional scrutiny with regard to any other officeholder, *ante,* at 968, n. 5. The *plurality* defines the question in this manner because Baca, the appellee challenging this provision, is a Justice of the Peace. But the *State* has defined the class of persons restricted by § 19 as all persons "holding a lucrative office under the United States, or [Texas], or any foreign government." And it has always been my understanding that " '[e]qual protection' . . . emphasizes disparity in treatment by a State between classes of individuals," in contrast to " '[d]ue process'," which "emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated." *Ross* v. *Moffitt,* 417 U. S. 600, 609 (1974). Accordingly, our equal protection cases have always assessed the legislative purpose in light of the class as the legislature has drawn it, rather than on the basis

of some judicially drawn subclass for which it is possible to posit some legitimate purpose for discriminatory treatment. See, *e. g.*, *Lubin* v. *Panish*, 415 U. S. 709, 717–718 (1974).[3] When the class of persons burdened by § 19, as the State has drawn it, is viewed in light of the asserted purposes of discouraging abuse of office and neglect of duty, it is beyond dispute that the class is substantially overbroad.

The plurality cannot, in the same manner that it avoids the overbreadth of the class, avoid the irrationality in the fact that § 19 applies *only* to candidacy for the Texas Legislature. Officeholders are free to run for President, the United States Senate, governor, mayor, city council, and many other offices. The distracting and corrupting effects of campaigning are obviously present in *all* campaigns, not only those for the legislature. The plurality responds to this characteristic of the legislative scheme by stating that "[t]he Equal Protection Clause allows the State to regulate 'one step at a time . . . .'" *Ante*, at 969, quoting *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489 (1955). But the record in this case belies any assertion by the State that it is proceeding "one step at a time." Article III, § 19, has existed in its present form since 1876. There is no legislative history to explain its intended purpose or to suggest that it is part of a larger, more equitable regulatory scheme.[4] And in the 106 years that

---

[3] The plurality's sudden focus on the fairness of the restriction to the individual as opposed to the class, is as episodic as it is novel. For in writing for the Court in *Weinberger* v. *Salfi*, 422 U. S. 749, 781 (1975), JUSTICE REHNQUIST refused to hold that an otherwise valid legislative classification should be *invalidated* on the basis of the characteristics of the individual plaintiff.

[4] Indeed, it may be that Art. III, § 19, was intended to do no more than prohibit dual officeholding. If it had been so construed, there would be no equal protection problem for there are blanket prohibitions in Texas against holding two elected offices at the same time. See Art. II, § 1; Art. XVI, § 40. In *Lee* v. *Daniels*, 377 S. W. 2d 618 (1964), the Texas Supreme Court construed the language in § 19, "during the term for which he was elected or appointed," to mean that even after an otherwise qualified candi-

have passed since § 19's adoption, the Texas Legislature has adopted no comparable bar to candidacy for other offices.

A state legislature may implement a program step by step, and an underinclusive regulation may be upheld where the record demonstrates that such "one step at a time" regulation is in fact being undertaken. See, e. g., *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 465–466 (1981); *McDonald* v. *Board of Election Comm'rs*, 394 U. S. 802, 809–811 (1969). I cannot subscribe, however, to the plurality's wholly fictional one-step-at-a-time justification. As JUSTICE STEVENS points out in his concurrence, the plurality's one-step-at-a-time response in this case "is simply another way of stating that there need be no justification at all for treating two classes differently during the interval between the first step and the second step—an interval that, of course, may well last forever." *Ante*, at 976.

Section 19's haphazard reach and isolated existence strikes me as the very sort of "arbitrary scheme or plan" that we distinguished from an as-yet-uncompleted design in *McDonald* v. *Board of Election Comm'rs, supra*, at 811, a case the plurality relies on to support the classification in this case, see *ante*, at 971. In *McDonald* the record demonstrated that in providing absentee ballots to certain classes of persons the State was in fact proceeding step by step. The State had demonstrated "a consistent and laudable state policy of add-

date for the legislature had resigned his current position, he could not hold legislative office. The dissent in *Lee* argued that § 19 was simply a prohibition on dual officeholding and the phrase, "during the term for which he is elected or appointed," simply "negates any basis for the contention that a person" who once held one of the offices covered by the section was still ineligible for the legislature after the completion of his term. *Id.*, at 621 (Steakley, J., dissenting). The Texas Supreme Court was unaided by any legislative history on this provision. We are of course bound by the state court's construction of this state provision, but I point out its ambiguity to highlight the dubious nature of the plurality's hypothesis that Art. III, § 19, marks one step in what will become more complete regulation of a perceived evil.

ing, over a 50-year period, groups to the absentee coverage as their existence comes to the attention of the legislature." 394 U. S., at 811. Article III, § 19, stands in stark contrast to the provision reviewed in *McDonald.* In this case, it is pure fiction for the plurality to declare that § 19 is one step in a broader and more equitable scheme that due to legislative delay and inadvertence is yet to be completed.

Appellants, unlike the plurality, at least attempt to justify the distinction between legislative campaigns and other campaigns. They argue that an officeholder-candidate will not enforce *legislative* policy if he or she is campaigning for a legislative seat. Brief for Appellants 9. But this attempted justification is unpersuasive. Appellants' argument apparently rests on the tenuous premise that a candidate is likely to choose the strategy of undermining the program of an incumbent opponent in order to advance his own prospects. It is plain that whatever force there is to this premise cannot be limited to a candidate for the legislature; it may as logically be argued that a judge will further his ambition for higher judicial office by failing to follow judicial decisions of a higher court, or that a state legislator with gubernatorial aspirations will use his present position to sabotage the program of the present administration. Even assuming that the State has a particular interest in protecting state *legislative* policy, and accepting appellants' somewhat dubious premise, it is still apparent to me that this asserted purpose is ill-served by the group of officeholders covered by § 19. Only those officeholders whose terms happen to *overlap* with the legislative term are prohibited from running for the legislature.[5] The

---

[5] For example, in *Lee* v. *Daniels, supra,* a County Commissioner resigned on February 1, 1964, and he sought thereafter to run for the legislature. However, his term did not expire until December 31, 1964; the legislative term commenced in November 1964, and the court therefore held that his name could not be placed on the legislative ballot. In contrast, in *Chapa* v. *Whittle,* 536 S. W. 2d 681 (Tex. Civ. App. 1976), the Director of a Social Culture Intervention Program began campaigning in February 1966. He resigned from his current office in May of that year. Because the Di-

District Court noted that this prohibition is most likely to bar the candidacy of mayors and city councilmen—persons who have little if anything to do with carrying out state legislative policy. *Fashing* v. *Moore*, 489 F. Supp. 471, 475 (WD Tex. 1980). Appointed administrators, District Attorneys, and District Judges—to name just a few—whose terms do not overlap with that of the legislature, but who are directly charged with carrying out legislative policy, are left free to campaign for the legislature while remaining in office. See, *e. g., Chapa* v. *Whittle,* 536 S. W. 2d 681 (Tex. Civ. App. 1976). It is thus clear that the prohibition on legislative campaigns in § 19 furthers in no substantial way the State's asserted interest in fidelity to legislative policy. In short, I can discern neither in the appellants' argument nor in the plurality's hypothesis any rational basis for the discriminatory burden placed upon this class of potential candidates.

I turn now to Art. XVI, § 65. That section applies only to persons holding any of approximately 16 enumerated offices.[6] With respect to persons holding these offices, Art. XVI, § 65, provides:

> "[I]f any of the officers named herein shall announce their candidacy, or shall in fact become a candidate, in any General, Special or Primary Election, for any office of profit or trust under the laws of this State or the United States other than the office then held, at any time when the unexpired term of the office then held shall exceed

rector had no set term, the complainant could not show that the Director's term overlapped the legislative term, beginning in November 1966, and the court therefore allowed the Director to run for the legislature.

[6] The assortment of offices restricted by Art. XVI, § 65, are: District Clerks; County Clerks; various County Judges; County Treasurers; Criminal District Attorneys; County Surveyors; Inspectors of Hides and Animals; County Commissioners; Justices of the Peace; Sheriffs; Assessors and Collectors of Taxes; District Attorneys; County Attorneys; Public Weighers; and Constables.

one (1) year, such announcement or such candidacy shall constitute an automatic resignation of the office then held . . . ."

Other officeholders, performing similar if not identical duties, are not within the reach of this or any similar restriction and are thus free to campaign for one office while holding another. Article XVI, § 65, while lacking § 19's broad sweep into areas completely beyond the purview of the State's concerns, restricts the candidacy only of an unexplained and seemingly inexplicable collection of administrative, executive, and judicial officials. The only distinguishing features of the officeholders collected in § 65 is that in 1954 their terms of office were increased from two to four years, and they all happen to be precinct, county, and district officials as opposed to members of the legislature or statewide elected officials. See 2 G. Braden, The Constitution of the State of Texas: An Annotated and Comparative Analysis 813 (1977). Neither appellants nor the plurality offer any explanation why the State has a greater interest in having the undivided attention of a "Public Weigher" than of a state criminal court judge, or any reason why the State has a greater interest in preventing the abuse of office by an "Inspector of Hides and Animals," than by a justice of the Texas Supreme Court. Yet in each instance § 65 applies to the former office and not to the latter. Again the plurality opines that the State is legislating "one step at a time." But while Art. XVI, § 65, is of more recent vintage than Art. III, § 19, it has been part of the Texas Constitution for 24 years without prompting any corresponding rule applicable to holders of statewide office. Thus § 65, like § 19, cannot in any realistic sense be upheld as one step in an evolving scheme.

In short, in my view, neither Art. III, § 19, nor Art. XVI, § 65, can survive even minimal equal protection scrutiny.[7]

---

[7] JUSTICE STEVENS argues in his concurrence that there is no federal interest in requiring the State to treat different elective state offices in a

## II

I also believe that Art. III, § 19, violates the First Amendment. The Court dismisses this contention by stating that this provision is a more limited restriction on political activities of public employees than we have upheld in prior cases. But none of our precedents presented a restriction on campaigning that applied even *after* an official had resigned from public office or to officials who did not serve in the regulating government. Moreover, the Court does not go on to address what is for me the crucial question: What justification does the State have for this restriction and how does this provision address the State's asserted interests?

The Court acknowledges that Art. III, § 19, restrains government employees' pursuit of political office. Such pursuit is clearly protected by the First Amendment and restrictions on it must be justified by the State's interest in ensuring the continued proper performance of current public duties. As the Court notes, similar competing considerations were considered in *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973), *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973), and *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1947).

In *United Public Workers,* the Court upheld § 9(a) of the Hatch Act, 5 U. S. C. § 7324(a)(2), which prohibits certain federal civil service employees from taking "an active part in political management or political campaigns." In *Letter Car-*

---

fair and equitable manner. *Ante,* at 974. I agree with JUSTICE STEVENS that the State may define *many* of the "benefits and burdens of different elective state offices" in a dissimilar manner without offering an explanation for the classifications that a federal judge will find to be rational, so long as such classifications do not mask any racial or otherwise impermissible discrimination. *Ibid.* But where the differential treatment concerns a restriction on the right to seek public office—a right protected by the First Amendment—that Amendment supplies the federal interest in equality that may be lacking where the State is simply determining salary, hours, or working conditions of its own employees.

*riers* the Court reaffirmed *United Public Workers,* and in *Broadrick* the Court upheld a similar state provision. In these cases, the Court determined that the restrictions were necessary to foster and protect efficient and effective government by keeping partisan politics out of the civil service. The Court recognized that "the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Letter Carriers, supra,* at 564, quoting *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968).

At the same time, this Court has unequivocally rejected the premise that one surrenders the protection of the First Amendment by accepting the responsibilities of public employment. *Elrod* v. *Burns,* 427 U. S. 347 (1976); *Pickering* v. *Board of Education, supra.* And the Court has clearly recognized that restrictions on candidacy impinge on First Amendment rights. See, *e. g., Illinois State Bd. of Elections* v. *Socialist Workers Party,* 440 U. S. 173 (1979); *Lubin* v. *Panish,* 415 U. S. 709 (1974); *American Party of Texas* v. *White,* 415 U. S. 767 (1974); *Bullock* v. *Carter,* 405 U. S. 134, 142–143 (1972); *Williams* v. *Rhodes,* 393 U. S. 23, 34 (1968).[8] Our precedents establish the guiding principle for applying the strictures of the First Amendment to restrictions of expressional conduct of state employees: The Court must arrive at an accommodation "'between the interests of the [employee]

---

[8] Such restrictions affect not only the expressional and associational rights of candidates, but those of voters as well. Voters generally assert their views on public issues by casting their ballots for the candidate of their choice. "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." *Illinois Elections Bd.* v. *Socialist Workers Party,* 440 U. S., at 184. The effect on voters from restrictions on candidacy is illustrated in this case by the fact that 20 of the appellees are voters who allege that they would vote for the officeholder-appellees were they to become candidates. See *ante,* at 961.

. . . and the interest of the [government], as an employer.'"
*CSC* v. *Letter Carriers, supra,* at 564, quoting *Pickering* v.
*Board of Education, supra,* at 568. And in striking the
required balance, "[t]he gain to the subordinating interest
provided by the means must outweigh the incurred loss of
protected rights." *Elrod* v. *Burns, supra,* at 362 (plural-
ity opinion). See also *United Public Workers* v. *Mitchell,*
*supra,* at 96.[9]

In undertaking this balance, I acknowledge, of course, that
the State has a vital interest in ensuring that public office-
holders perform their duties properly, and that a State
requires substantial flexibility to develop both direct and
indirect methods of serving that interest. But if the State's
interest is not substantially furthered by the challenged
restrictions, then the restrictions are an unnecessary intru-
sion into employee rights. If the restriction is effective, but
interferes with protected activity more than is reasonably
necessary to further the asserted state interest, then the
overintrusive aspects of the restriction lack constitutional
justification. In short, to survive scrutiny under the First
Amendment, a restriction on political campaigning by gov-
ernment employees must be narrowly tailored and substan-
tially related to furthering the State's asserted interests.

It is clear to me that Art. III, § 19, is not narrowly tailored
to conform to the State's asserted interests. Nor does it fur-
ther those interests in a meaningful way. I have discussed
briefly the broad sweep and thus the absence of narrow
tailoring of § 19 in Part I, *supra.* Section 19 bars the candi-
dacy of a wide class of state, federal, and foreign office-
holders. The offices enumerated in § 19 include the judges of
all courts, the Secretary of State, the Attorney General, the

---

[9] "[T]his Court must balance the extent of the guarantees of freedom
against a congressional enactment to protect a democratic society against
the supposed evil of political partisanship by classified employees of gov-
ernment." 330 U. S., at 96.

clerks of any court of record, and all persons holding any "lucrative" office under the United States, Texas, or any foreign government. Section 19 by its terms would bar, for example, a retired United States District Court Judge, appointed for life, whose District was outside of Texas, from running for the Texas State Legislature. The Texas courts have interpreted "lucrative" broadly enough to include any office that yields profit, gain, revenue, or salary, regardless of the adequacy of the compensation. See *Willis* v. *Potts*, 377 S. W. 2d 622, 625–627 (Tex. 1964). The state courts have also held that offices created by political bodies subordinate to the State, such as cities, are covered by § 19. See, *id.*, at 624–625.

Section 19 is not merely a resign-to-run law, or a prohibition on dual officeholding. Rather, the Texas Supreme Court has construed the phrase, "during the term for which he was elected or appointed," to bar candidacy for the legislature even *after* an official has resigned from his current office. See n. 4, *supra*. As one commentator has noted, § 19 "has trapped the unwary who believed (not unreasonably) that by resigning their present office they would be eligible to run for the legislature." 1 G. Braden, The Constitution of the State of Texas: An Annotated and Comparative Analysis 135 (1977).

In many of its applications § 19 has absolutely *no* connection to Texas' interest in how Texas public officials perform their current duties. This provision applies to persons holding office under the United States or any foreign government and would thus bar a person holding *federal* office from resigning from that office and running for the Texas Legislature.[10] Even with respect to persons who, like Baca, are

---

[10] The Court, citing *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612–616 (1973), states that Baca may not utilize the "overbreadth" doctrine to "challenge the provision's application to him on the grounds that the provision might be unconstitutional as applied to a class of officeholders not before

currently Texas public officials, § 19 continues to operate
after their resignations from current positions have taken
effect and their responsibility to the Texas electorate has
ceased.   A provision directed only at Texas officeholders,
that gave those officeholders a choice between resigning and
serving out their current terms would serve all of the as-
serted state interests; yet Texas has inexplicably chosen this
far more restrictive alternative.[11]

The same irrationality evident to me when I analyzed § 19
under the Equal Protection Clause convinces me that it is not
substantially related to furthering the asserted state inter-
ests.   Appellants contend that § 19 promotes attention to

---

the Court." *Ante,* at 972, n. 6.   But all that *Broadrick* holds is "that the
overbreadth of a statute must not only be real, but substantial as well,
judged in relation to the statute's plainly legitimate sweep."   413 U. S., at
615.   In my view, the overbreadth of Art. III, § 19, is clearly substantial,
particularly when its breadth is viewed in relationship to its relatively ten-
uous "legitimate sweep."

[11] The less intrusive means for accomplishing the State's goals are obvi-
ous.   A statute requiring persons to take a leave of absence would also
preclude an officeholder from misusing his current office during a cam-
paign.   See *Bolin* v. *Minnesota,* 313 N. W. 2d 381, 384 (Minn. 1981).   Ap-
pellants assert an interest in ensuring that defeated candidates do not
return to office and administer their old position vindictively or half-
heartedly.   Brief for Appellants 9.   But this would be satisfied by a
resign-to-run statute—giving candidates a choice between running for a
new office or holding their present position.   Appellants suggest that even
before an actual announcement of candidacy a potential candidate may
begin to abuse his current office.   *Id.,* at 13.   They thus appear to suggest
that a resign-to-run provision is not necessarily adequate because it allows
the candidate to stay in his current position until his formal announcement
of candidacy.   Even if this is a sufficient state concern to justify further
intrusion on the interests of potential candidates, it would be fully served
by a statute that simply required all potential candidates to resign some
period of time *before* they formally announced their candidacy for a new
office.   Unlike the plurality, I refuse to assume that the State has an inter-
est in having officeholders who no longer desire to hold their office serve
out their terms.   See *ante,* at 968–969.   Indeed, appellants have not as-
serted this interest in this Court or in the courts below.

current duties by officeholders and prevents abuse of their current office in the attempt to further political aspirations. But § 19 prohibits the enumerated officeholders from engaging only in Texas *legislative* campaigns. It has absolutely no effect on an officeholder who misuses his current office in order to undertake a campaign for any other office. Even if no improper motive underlies the restriction, it is obvious that § 19 is far more likely to discourage officeholders from running for the state legislature than it is to encourage them to serve properly in their current positions. See *supra*, at 980–983.

In sum, the prohibition of § 19 furthers in no substantial way any of the asserted state interests said to support it, and is not narrowly tailored to avoid unnecessary interference with the First Amendment interests of government employees. Accordingly, in my view, this provision is invalid as an unjustified infringement on appellees' First Amendment rights.[12]

Because the Court finds neither an equal protection nor a First Amendment violation in either of these restrictions on candidacy, I respectfully dissent.

---

[12] Article XVI, § 65, also affects appellees' right to run for political office; it has a lesser impact on that right for it merely requires that candidates resign before embarking on political campaigns. Moreover, it bears a more substantial relationship to the State's asserted purposes because it bans political campaigns for all offices. That provision does not in my view violate the First Amendment. Because it applies only to an inexplicable group of elected officials, it does, however, violate the Equal Protection Clause.