**William M. HATTEN, Plaintiff–Appellant,**

v.

**Jack M. RAINS, Secretary of State for the State of Texas, et al., Defendants–Appellees.**

No. 87–6302.

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1988.

Karen A. Lerner, Houston, Tex., for plaintiff-appellant.

Lauri J. Schneidau, Atty. Gen., Lou Bright, Asst. Atty. Gen., Austin, Tex.,

David F. Webb., Houston, Tex., for defendants-appellees.

Before GOLDBERG, GARWOOD and JOLLY, Circuit Judges.

GOLDBERG, Circuit Judge:

I write today, at 82 years of age, with a heavy pen and an even heavier heart. The Honorable Judge William Hatten has served his district ably for over 20 years. His ample competence is stipulated by all parties. Yet today we are compelled by precedent to inform Judge Hatten that he may not be a candidate for reelection, simply because, tomorrow, he will celebrate his seventy-fifth birthday.

Judge Hatten challenges Art. V, § 1–a of the Texas Constitution ("Art. V, § 1–a"), which requires all Texas judges to retire at the age of 75. This appeal raises two issues under the Equal Protection Clause of the Fourteenth Amendment: first, whether a mandatory retirement age for judges, standing alone, constitutes invidious discrimination; and, second, whether mandatory judicial retirement, by barring Appellant from the ballot, violates the fundamental first amendment right to associate of Judge Hatten and his supporters.

I sincerely wish that our birthday message could be a happier one. However, the people of Texas have chosen youth over wisdom, and we are not free to meddle with their choice:[1] the district court heard unrebutted evidence that judicial ability declines with age; and, more importantly, the Supreme Court has spoken twice, though summarily, in cases with virtually identical facts.[2]

Though there is some merit to Judge Hatten's argument that Art. V, § 1–a, violates fundamental first amendment rights,

---

**1.** The framers of the United States Constitution made the opposite choice. Article III grants federal judges life tenure. This choice has certain costs, but it also has its benefits. Many noted judges have served ably, well into their eighties and even nineties and have made crucial contributions to our jurisprudence. Chief Justice Marshall served until the age of 80 and wrote at least 96 opinions after the age of 75, including such important opinions as *Barron v. Mayor and City of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). Oliver Wendell Holmes served on the court until he was 91 years of age, writing at least 471 opinions after the age of 75, including many dissents which have shaped the course of modern law. These opinions include *Black & White Taxicab Co. v. Brown & Yellow Taxicab Co.,* 276 U.S. 518, 532, 48 S.Ct. 404, 408, 72 L.Ed. 681 (1928) (Holmes, J., dissenting); *Beech–Nut Packaging Co. v. Lorillard Co.,* 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810 (1927); *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Gitlow v. New York,* 268 U.S. 652, 672, 45 S.Ct. 625, 632, 69 L.Ed. 1138 (Holmes, J., dissenting); *Adkins v. Children's Hospital,* 261 U.S. 525, 567, 43 S.Ct. 394, 404–405, 67 L.Ed. 785 (1923) (Holmes, J., dissenting); *Truax v. Corrigan,* 257 U.S. 312, 342, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921) (Holmes, J., dissenting); *Smith v. Kansas City Title & Trust,* 255 U.S. 180, 213, 41 S.Ct. 243, 249–250, 65 L.Ed. 577 (1921) (Holmes, J., dissenting); *Abrams v. United States,* 250 U.S. 616, 624, 40 S.Ct. 17, 20, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *Frohwerk v. United States,* 249 U.S. 204, 39 S.Ct.

249, 63 L.Ed. 561 (1919); *Debs v. United States,* 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566 (1919); *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); *Hammer v. Dagenhart,* 247 U.S. 251, 277, 38 S.Ct. 529, 533, 62 L.Ed. 1101 (1918) (Holmes, J., dissenting). Similarly, Louis Dembitz Brandeis served ably until his 83rd year, writing at least 113 opinions after reaching the age of 75. These opinions include *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Bradford Electric Light Co. v. Clapper,* 286 U.S. 145, 52 S.Ct. 571, 76 L.Ed. 1026 (1932); *Crowell v. Benson,* 285 U.S. 22, 65, 52 S.Ct. 285, 298, 76 L.Ed. 598 (1932) (Brandeis, J., dissenting). It is impossible to quantify the benefits to the nation of those additional years. Our case law is immeasurably richer because of the opinions cited above.

**2.** In *Diamond v. Cuomo,* 70 N.Y.2d 338, 520 N.Y.S.2d 732, 514 N.E.2d 1356 (1987), *appeal dismissed,* —— U.S. ——, 108 S.Ct. 2008, 100 L.Ed.2d 597 (1988), and *Maresca v. Cuomo,* 64 N.Y.2d 242, 485 N.Y.S.2d 724, 475 N.E.2d 95 (1984), *appeal dismissed,* 474 U.S. 802, 106 S.Ct. 34, 88 L.Ed.2d 28 (1985), the Supreme Court examined New York laws requiring retirement of elected judges at the age of 70. Both times the New York Court of Appeals upheld the law, and both times the Supreme Court dismissed the appeals for lack of a substantial federal question.

our hands are tied by the Supreme Court.[3] Perhaps unfolding years will open eyes that are now closed. Until then we are bound by precedent to affirm.

## I. Facts

William Hatten is currently the elected judge of the 176th Judicial District of Harris County, Texas. He has held this post for the last twenty years. On August 26, 1988, Judge Hatten will turn 75. His term of office expires December 31, 1988. Under Art. V, § 1–a of the Texas Constitution, when a sitting judge turns 75, his seat becomes automatically vacant. Thereafter, judges over the age of 75 are entitled to sit as visiting or temporary judges at the discretion of the administrative judge of a state judicial district.

 Because Judge Hatten will be over 75 before the beginning of his next term, he is ineligible to be placed on the ballot. Larry Veselka, Chairman of the Harris County Democratic Party, accordingly refused Judge Hatten's nominating petitions. Judge Hatten brought this suit challenging the constitutionality of Art. V, § 1–a, and seeking access to the ballot.[4] Mr. Veselka then joined the lawsuit on behalf of the Harris County Democratic Party, as did several of Judge Hatten's supporters, claiming violation of their first amendment rights.

The district court held that Art. V, § 1–a, is constitutional. Judge Hatten appeals.

## II. Discussion

The equal protection clause of the fourteenth amendment guards against invidious discrimination. The clause invalidates classifications enacted with the intent to disadvantage a particular group, or which operate to deprive a class of people of their fundamental rights. Intent to discriminate is rarely evident on the face of a statute. The Supreme Court therefore examines the means-ends fit between a classification and its proffered legislative goal. The underlying insight is that the tighter the fit, the less likely the proferred justification is to be a pretext for intentional discrimination. The Supreme Court has used a multi-tiered, some would say sliding scale, analysis. Classifications which "impermissibly interfere with the exercise of a fundamental right or operate[ ] to the peculiar disadvantage of a suspect class" are subjected to strict judicial scrutiny, and must constitute the least restrictive means to achieve a compelling state interest. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *San Antonio School District v. Rodriguez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973). Classifications which operate to the peculiar disadvantage of a quasi-suspect class are accorded inter-

---

3. "Votes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits." *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975) (quoting *Ohio ex rel. Eaton v. Price,* 360 U.S. 246, 79 S.Ct. 978, 3 L.Ed.2d 1200 (1959)). We are therefore bound, even if a theory not raised in the earlier case would lead to a different result. *See Hardwick v. Bowers,* 760 F.2d 1202, 1213 (11th Cir.1985) (Kravitch, J., concurring in part, dissenting in part), *rev'd,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

4. Although the Democratic primary was held on March 8, 1988, this lawsuit is not moot for three reasons. First, Judge Hatten retains an interest in the litigation generally, because he remains permanently barred from future judicial elections in Texas. Second, even if Judge Hatten did not intend to seek judicial office in the future, this lawsuit is not moot with respect to this election. The law is clear in this circuit that an unconstitutional election is void. If un-

constitutional state action deprives a candidate of ballot access, or if unconstitutional state action deprives the election itself of its validity, federal courts have authority to invalidate the election and to hold a new election. *Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967); *Hamer v. Campbell,* 358 F.2d 215 (5th Cir.), *cert. denied,* 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966). Finally, the Supreme Court has heard a number of election cases after the general election, even when there was no chance of retrospective relief, because the cases were capable of repetition yet evasive of review. *American Party of Texas v. White,* 415 U.S. 767, 770 n. 1, 94 S.Ct. 1296, 1300–1301 n. 1, 39 L.Ed.2d 744 (1974); *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974). *See Morial v. Judiciary Com. of Louisiana,* 565 F.2d 295, 297 n. 3 (5th Cir.1977) (en banc), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978).

mediate scrutiny, and must bear a significant relationship to an important state end. *See, e.g., Kirchberg v. Feenstra,* 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). All other classifications need only bear a rational relationship to a legitimate legislative end. *See, e.g., City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

To determine the constitutionality of Art. V, § 1–a, we must first determine the level of scrutiny accorded classifications based on age, and whether the proffered justifications for that classification achieve the required means-end fit. We must then determine whether excluding Judge Hatten from the ballot burdens the fundamental rights of Judge Hatten or his supporters. We deal with these questions in order.

### A. Scrutinizing Classifications Based on Age

#### 1. Rational Basis Review

■ In *Massachusetts Board of Retirement v. Murgia,* 427 U.S. at 307, 96 S.Ct. at 2562, the Supreme Court determined that classifications based on age alone are entitled to only rational basis review. The Court examined a Massachusetts statute that required uniformed state police officers to retire at the age of fifty.[5]

First, the Court addressed whether the elderly are a suspect class. As the Court put it, to be treated as a suspect class a group must have been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or rele-

gated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." 427 U.S. at 313, 96 S.Ct. at 2566–2567 (quoting *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293–1294). Applying this standard, the Court noted, first, that while the treatment of the aged in the United States has not been wholly free of discrimination, the aged have not been "subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities," *Murgia,* 427 U.S. at 313, 96 S.Ct. at 2566–2567, and second, that "old age does not define a 'discrete and insular' group, *United States v. Carolene Products Co.,* 304 U.S. 144, 152–152 n. 4, 58 S.Ct. 778, 783–784 n. 4, 82 L.Ed. 1234 (1938), in need of 'extraordinary protection from the majoritarian political process.' Instead, it marks a stage that each of us will reach if we live out our normal span." *Murgia,* 427 U.S. at 313–314, 96 S.Ct. at 2566–2567. The Court therefore deemed age to be a non-suspect classification, subject to only rational basis review.

Applying rational basis review to the statute, the *Murgia* Court noted that the state may legitimately seek "to protect the public by assuring physical preparedness of its uniformed police," *Murgia,* 427 U.S. at 314, 96 S.Ct. at 2567, and conceded that physical ability generally declines with age. The statute withstood rational basis review, even without any scientific evidence that any particular level of deterioration begins at age fifty.[6]

---

**5.** A three judge court held that "a classification based on age 50 alone lacks a rational basis in furthering any substantial state interest," *id.* 565 F.2d at 316 (quoting *Murgia v. Massachusetts Board of Retirement,* 376 F.Supp. 753, 754 (D.Mass.1974)). That court conceded that there was a relationship between age and the ability to perform the strenuous tasks which are required of a policeman. Without deciding precisely what level of scrutiny was required, the court held that because Massachusetts already engaged in rigorous physical evaluation of police officers over the age of forty, a per se retirement rule served no rational purpose.

**6.** Justice Marshall in dissent conceded that the aged are not a suspect class in the same way as Blacks. However, he argued that the strict two tier analysis followed by the Court was inade-

quate for dealing with the broad variety of classifications faced by modern legislatures. The strict two tier analysis used by the Court divided all classifications between those subject to strict scrutiny, which would always fail, and those subject to rational basis review, which would always survive. Justice Marshall argued, as he has frequently, and with force, for a sliding scale that would increase the level of scrutiny applied to a classification if it disadvantages a group in an area where they have been traditionally subjected to discrimination. Noting that employment is an area in which the elderly have been particularly subjected to discrimination, Justice Marshall argued for elevated, though not strict scrutiny. Applying this level of scrutiny to the case, Marshall conceded that the law served a legitimate state end—guaran-

The Supreme Court amplified the teachings of *Murgia* in *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), where it considered the constitutionality of a maximum retirement age of 60 for foreign service officers. The Court reiterated that the aged, as a group, were not entitled to special judicial protection, and emphasized just how minimal that protection was:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

440 U.S. at 98, 99 S.Ct. at 943. Applying this standard, the Supreme Court concluded that the mandatory provision served the legitimate goals of maintaining a vigorous service and creating promotion opportunities for younger officers.

### 2. Rational Basis Review of Mandatory Judicial Retirement

■ A number of federal and state courts have reviewed legislation setting mandatory judicial retirement ages. They have been unanimous in their conclusion that the Constitution allows states to require both elected and appointed judges to retire on or after their seventieth birthday. *Malmed v. Thornburgh*, 621 F.2d 565 (3rd Cir.), *cert. denied*, 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980) (Pennsylvania constitutional provisions requiring retirement of judges at 70 upheld as rational); *Trafelet v. Thompson*, 594 F.2d 623 (7th Cir.), *cert. denied*, 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979) (Illinois statutory provision requiring retirement of elected judges at 70 upheld as rational); *Rubino v. Ghezzi*, 512 F.2d 431 (2d Cir.), *cert. denied* 423 U.S. 891, 96 S.Ct. 187, 46 L.Ed. 2d 122 (1975) (New York statute requiring retirement of elected judges at 70 upheld).

Most recently, New York has passed on the same issue twice, both times upholding mandatory judicial retirement of elected judges at 70. Both times the Supreme Court has dismissed the appeals for want of a substantial federal question. *Diamond v. Cuomo*, 70 N.Y.2d 338, 520 N.Y. S.2d 732, 514 N.E.2d 1356 (1987), *appeal dismissed*, —— U.S. ——, 108 S.Ct. 2008, 100 L.Ed.2d 597 (1988); *Maresca v. Cuomo*, 64 N.Y.2d 242, 485 N.Y.S.2d 724, 475 N.E.2d 95 (1984), *appeal dismissed*, 474 U.S. 802, 106 S.Ct. 34, 88 L.Ed.2d 28 (1985). As we noted above, such dismissals are on the merits, and binding on lower courts. *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975).[7]

Art. V, § 1–a has no reported legislative history. A contemporary article in the *Texas Bar Journal* points out that the goal of the amendment was to insure that "judges retire when they should." W.S.J. Garwood, *Involuntary Retirement and Removal of Appellate and District Judges*, [1964] Texas B.J. 947, 949. The article notes that the constitutional amendment conforms with the A.B.A. "Model Plan for Judicial Disability and Retirement." *Id.* at 1007.

In *Malmed*, 621 F.2d at 573, the Third Circuit examined this question. They not-

---

teeing the physical fitness of law enforcement officials—but argued that the particular age chosen by the Massachusetts legislature was arbitrary. Fifty, he argued, was lower than any other mandatory retirement age in any other police force in the country. As such, he would have held the mandatory retirement age unconstitutional.

**7.** Though the equal protection clause of the fourteenth amendment provides little protection from discrimination on the basis of age, the elderly are not without some protection against the evils of prejudice. In 1967, Congress enacted the Age Discrimination in Employment Act ("ADEA"), Pub.L. No. 90–202, 81 Stat. 602 (codified as amended at 29 U.S.C. §§ 621–634 (1982)). The ADEA renders it unlawful for employers to discriminate against persons over forty on the basis of age. 29 U.S.C. §§ 623(a), 631. *Thornbrough v. Columbus and Greenville R.R.*, 760 F.2d 633 (5th Cir.1985). The ADEA does not apply to elected state officials. 29 U.S.C. § 630(f).

ed that mandatory judicial retirement conformed with the A.B.A. recommendation and fleshed out the goal of insuring that a judge retire "when he should," arguing: (1) that mandatory retirement would create a pool of part-time judges; (2) that mandatory retirement eliminates the unpleasantness of selectively removing aged and disabled judges; and (3) that the harm done by a few disabled judges more than offsets the loss of judges who retain full powers.

These proffered rationales constitute a sufficient basis for a legislative enactment reviewed for mere rationality. We must therefore conclude that a mandatory retirement age of 75 does not, by itself, violate the equal protection clause.

## B. Fundamental Rights?

■ Recognizing that age is not a suspect classification, and that there is a rational reason for requiring mandatory judicial retirement, Judge Hatten makes a second equal protection argument. Because he is ineligible for office, he has been refused access to the ballot. He argues that this ballot access restriction violates the fundamental first amendment right of political association. As we have noted, classifications which impermissibly infringe fundamental rights are invalid under the equal protection clause. *Murgia*, 427 U.S. at 312, 96 S.Ct. at 2566. Judge Hatten's argument therefore has substantial force. However, as we have noted, a summary dismissal by the Supreme Court of an appeal as of right is a dismissal on the merits, and we are bound by the Supreme Court's decisions in *Diamond* and *Maresca*. But for these decisions, it might be necessary to decide otherwise.

## 1. Whose Right to What?

■ There is no fundamental right to be a candidate. "Far from recognizing candidacy as a 'fundamental right,'" the Supreme Court has "held that the existence of barriers to a candidate's access to the ballot 'does not itself compel close scrutiny.'" *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) (quoting *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 855–856, 31 L.Ed.2d 92 (1972)). Limitations on ballot access nonetheless burden two fundamental rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasions to cast their votes effectively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). In examining ballot access restrictions, the Court has focused on the rights of particular classes of voters to elect a candidate of their choice. The ballot access cases focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the "availability of political opportunity." *Id.* 107 S.Ct. at 540 (quoting *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974)).[8]

## 2. What Level of Scrutiny?

■ The Supreme Court has never stated the level of scrutiny applicable to ballot access restrictions with crystal clarity.[9]

---

**8.** Judge Hatten has standing to raise this issue. He has stated that he is his own preferred candidate and would vote for himself if allowed to run. In addition, several of Judge Hatten's supporters have intervened in this lawsuit as parties plaintiff.

**9.** The cases got off to a rocky start. In *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) the Supreme Court invalidated Ohio election laws that effectively excluded all minor parties from the ballot. The Court applied strict scrutiny, holding that the election laws violated

both the fundamental right of association and the fundamental right to vote. The Court, however, did little to explain the scope of the rights violated and why some restrictions on ballot access might be subject to strict scrutiny while others might not.

The Supreme Court's next ballot access case did little to clear up this confusion. In *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court refused to apply strict scrutiny to Georgia's less restrictive petition requirements and filing fees, but failed to

The rigid multi-tiered approaches outlined above are too rigid for dealing with ballot access cases. There is no question that the rights to vote and to associate are fundamental. There is also no question that some regulation of access to the ballot is necessary in order to conduct orderly elections, and that the states have some authority to establish qualifications for office. As Justice Stevens recognized, any election regulation "inevitably effects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–1570, 75 L.Ed.2d 547 (1983).

The Supreme Court has taken several different approaches to resolving this conundrum. Justices Brennan and Marshall would apply strict scrutiny to, and invalidate, any restriction which burdens the right to vote. *See, e.g., Munro,* 107 S.Ct. at 540 (Marshall, J., dissenting); *Williams v. Rhodes.* Justice White's views have evolved. At first he recognized that strict scrutiny applies, but found a compelling state interest in orderly elections and therefore in a comprehensible ballot. *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). More recently he has departed from this approach in favor of a more ad hoc approach that fails to mention strict scrutiny, and that also fails to apply any requirement of least restrictive means. *See, e.g., Clements v. Fashing; Munro.* Finally, Justice Stevens has applied a form of heightened rational basis review which requires a court to balance the right asserted against the harshness of the restriction. *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

Thus, the Court has successfully distinguished sensible restrictions on access to the ballot from those that are egregiously discriminatory, but they have done so by applying varying standards. The Supreme Court has upheld a law which requires officials to resign from office before running for any other office, *Clements,* 457 U.S. at 957, 102 S.Ct. at 2836 (applying an ad hoc approach), and reasonable petition requirements, *Munro v. Socialist Workers Party* (ad hoc); *Storer v. Brown* (strict scrutiny, compelling state interest found); *American Party v. White* (strict scrutiny, compelling state interest found), but has invalidated highly restrictive petition requirements which disadvantage small parties, *Williams v. Rhodes* (strict scrutiny); *Anderson v. Celebrezze* (heightened rational basis review), and filing fee requirements which provide no alternative procedures for indigents, because such requirements exclude poor people from the ballot. *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (strict scrutiny); *Bullock v. Carter,* 405 U.S. at 134, 92 S.Ct. at 849 (strict scrutiny). As Professor Tribe has pointed out, the doctrinal sum of these cases is that severe restrictions on ballot access will be overturned, while minimal restrictions will not. He stated, "while from the viewpoint of political theory this result may be tolerable, as a pronouncement of doctrine under the equal protection clause, it is positively delphic." Tribe, *American Constitutional Law* § 1320 (2d Ed.1988).

Justice Stevens has, perhaps, come closest both to describing the Supreme Court's actual approach, and to finding a method for reconciling the right to vote with the states' interest in orderly elections and job qualifications. In *Anderson v. Celebrezze,* he applied a form of heightened rational basis review, saying that a "State's important regulatory interests [have generally been held] sufficient to justify reasonable, non-discriminatory restrictions." *Id.* 460 U.S. at 788, 103 S.Ct. at 1569–1570. Rather than establishing a standard, the Court articulated a framework for analyzing ballot access restrictions, stating:

> [A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amend-

explain what distinguished the Georgia restric-

tions from those invalidated in *Williams.*

ments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of these interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.... The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." [*Storer*, 415 U.S. at 730, 94 S.Ct. at 1279].

460 U.S. at 788–789, 103 S.Ct. at 1569–1570

### 3. The Standard in This Circuit

In this circuit we have long applied a case by case method of analysis similar to that now required by *Anderson*, and have developed principles for determining what restrictions are reasonable. In *Morial v. Judiciary Commission of Louisiana*, 565 F.2d 295 (5th Cir.1977) (en banc), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed. 2d 395 (1978) we examined a Louisiana law which required judges to resign before running for any other political office. We stated that

> the requisite closeness of the means-end relations must be determined on a case-by-case basis. The standard to be applied in any case is a function of the severity of impairment of first amendment interests. As the burden comes closer to impairing core first amendment values ... or impairs some given first amendment value more substantially, ... the requisite closeness of fit of means and end increases accordingly.

*Id.* 565 F.2d at 300. In *Morial*, we recognized that the first amendment protects the marketplace of ideas, and that such protection extends not just to the right to speak, but to the right to elect representatives

sympathetic to a given group or viewpoint. We therefore held that ballot access restrictions are invalid if their effect is "to exclude candidates of an identifiable group or viewpoint." *Id.* 565 F.2d at 302. Applying this standard, we upheld the Louisiana law because, though it affected the rights of certain candidates, it had no impact whatsoever on the rights of any particular group of voters.

Similarly, in *Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir.1978), we stated that ballot access restrictions "are not unconstitutional unless 'they are so restrictive that they deny a cognizable group a meaningful right to representation.'" *Id.* at 1126 (5th Cir.1978) (quoting Tribe, *American Constitutional Law*, § 13–19 (1978)). There we examined whether Florida's sunshine law constituted an unconstitutional restriction. The law required all candidates for office to submit financial disclosure statements as a precondition to candidacy. We held that although such a requirement might place a greater burden on wealthy candidates, it did not exclude them from office. It constituted only a deterrent by way of inconvenience, not a bar to political participation.

### 4. Application of This Circuit's Law

■ Thus, this circuit uses a two part analysis. First a group must be cognizable, or identifiable, and second, it must be excluded from meaningful representation. In *Plante* it was not necessary to reach whether the rich are a cognizable group, because the statute did not create a complete bar to access. In *Morial*, though incumbent judges were excluded from running for other offices, this did not affect the rights of any identifiable group of voters.[10]

The logic of the Supreme Court's ballot access cases, as applied in this circuit, would require us to examine whether the effect of Art. V, § 1–a, is a complete bar to candidacy, not merely an inconvenience.

---

10. In *Trafelet v. Thompson,* 594 F.2d at 623, the Seventh Circuit read the cases of our circuit somewhat differently, but the court there failed to appreciate the particular impact of mandatory judicial retirement on elderly voters.

**696**

Unlike the provision in *Morial,* Art. V, § 1–a, acts to the disadvantage of a distinct group of voters. Though the aged are not a suspect class, there is no doubt that they are a cognizable group of voters. Age, like gender, is a classification which cuts across all socio-economic, ethnic and racial lines. However, the aged are a group with political interests that are distinct from those of the young. Social Security, health care, pension law, and age discrimination are all issues in which the elderly have a particular interest.

Of course, Mr. Hatten is running for judge. Judges, even if elected, do not serve a primarily representative function. Yet no one can deny that the presence in the modern judiciary of judges of different races and backgrounds has improved the quality of justice in Courts of the United States.

■ The logic of *Plante* and *Morial* suggests that in this circuit, a per se rule excluding the aged from political office would be constitutionally unreasonable under the fourteenth amendment.[11]

### III. Conclusion

Though swayed by Judge Hatten's argument, we are bound by *Diamond* and *Maresca.* Even though neither case addressed the arguments discussed above, a summary dismissal is a decision on the merits, binding on the lower courts. *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1959). Unfortunately, Judge Hatten's only redress lies with the Supreme Court. The judgment of the district court must be AFFIRMED.

GARWOOD, Circuit Judge, with whom E. GRADY JOLLY, Circuit Judge, joins specially concurring:

I concur in the result and in all of Judge Goldberg's eloquent opinion save part IIB

and so much thereof as implies criticism of the challenged provision of the Texas Constitution. Any age requirement for an office or position is necessarily arbitrary and will inevitably exclude some number of those who are more qualified than some not so excluded, of which, as applied here, Judge Goldberg would be anyone's "Exhibit A." But this does not mean that such requirements are unreasonable: the generality of legislative or constitutional provisions is the norm; and the United States Constitution contains numerous age requirements. Neither such provisions nor those here challenged are intended to deprive of representation that portion of the population not meeting their requirements; they are rather intended to enhance the average of the abilities of the officeholders in question, and are rationally related to that goal. Age is not a suspect or quasi-suspect classification, and in my view is not comparable to race or gender or economic status. That Texas judges are elected rather than chosen in some other manner should not be decisive on the issue of required qualifications. As Judge Goldberg says, judges are not representatives. Judge Hatten has had, as others have had and will have, ample opportunity to serve his state in a judicial capacity, and he has availed himself of it, to his credit and the benefit of his state. But, like any other citizen of Texas, he is properly subject to Article V § 1–a of the Texas Constitution, which the people of Texas adopted in 1965.

---

11. A "state is clearly vested with the power to prescribe reasonable citizenship, [minimum] age, and residency requirements on the availability of the ballot ... and the power to prescribe reasonable qualifications extends to candidates for office." *Henderson v. Fort Worth Independent School Dist.,* 526 F.2d 286, 292 (5th Cir.1976). However, in determining what restrictions are reasonable we are controlled by the specific guarantees of the first and fourteenth amendments. A conclusive presumption that old judges are incompetent denies the aged the right to political association. There is, however, no doubt that a state could constitutionally adopt a procedure for removing judges as a result of senility or incompetence, that focused on the judge's ability to do his or her job.