Dear Representative Glover,
¶ 0 This office has received your request for an Attorney General Opinion. You have asked, in effect, the following question:
Does Section 1404 of Title 20, which mandates that a judicialofficer must vacate his office when he becomes a candidate forany nonjudicial or judicial office, violate the First Amendmentor the Equal Protection Clause of the Fourteenth Amendment to theConstitution of the United States of America?
¶ 1 You inquired about a particular portion of a statute, 20O.S. Supp. 1998, § 1404[20-1404], which reads:
 A. As used in this section, the term "judicial officer" includes the judges of all courts created by the state or municipalities of the state.
 B. In addition to the causes specified in Article VII-A, Section 1 of the Oklahoma Constitution, the acts and omissions enumerated below shall constitute grounds for the removal by the Court on the Judiciary of a judicial officer from his office, with or without disqualification to hold a judicial office in the future:
. . . .
 5. A judicial officer becoming a candidate for any nonjudicial office or for another judicial office whose term is to commence before the expiration of his present term of office; provided that no judge holding a nonelective judgeship shall become a candidate in a race in which the incumbent seeks to retain an elective judicial office unless he first resign his appointive judgeship.
20 O.S. Supp. 1998, § 1404[20-1404].
¶ 2 When reviewing a statute's constitutionality, it is important to remember a legislative act is presumed to be constitutional and will be upheld unless it is "clearly, palpably and plainly inconsistent with the Constitution." Reherman v.Oklahoma Water Resources Board, 679 P.2d 1296, 1300 (Okla. 1984). The Oklahoma Supreme Court has stated that acts of the Legislature are constitutionally valid "unless they are shown beyond a reasonable doubt to violate the Constitution." City ofBethany v. Public Employees Relations Board of Oklahoma,904 P.2d 604, 613 (Okla. 1995) (citing Earnest, Inc. v. LeGrand,621 P.2d 1148, 1152 (Okla. 1980)); Board of Regents for OklahomaAgricultural Mechanical Colleges v. Oklahoma State Regents forHigher Education, 497 P.2d 1062, 1068-69 (Okla. 1972); Schmittv. Hunt, 359 P.2d 198, 200 (Okla. 1960)).
 I. FIRST AMENDMENT A. Precedent
¶ 3 Political speech, even that uttered by a candidate in an election, is not absolutely free of restriction by the state.See United States Civil Service Commission v. NationalAssociation of Letter Carriers, 413 U.S. 548, 556 (1973) (upholding Hatch Act prohibiting federal employees from becoming partisan candidates for public office); Broadrick v. Oklahoma,413 U.S. 601, 616-17 (1973) (upholding prohibition on state employees becoming candidates for paid public office). Oklahoma has likewise adhered to this general principle. See Acevedo v.City of Muskogee, 897 P.2d 256 (Okla. 1995) (although a policeman's speech encompassed a matter of public concern, the potential injury to the City's ability to operate its police department outweighed the employee's interest in expression).
¶ 4 State restrictions on political speech are subject to exacting scrutiny by the courts. Although a reviewing court may recognize a government "has an interest in regulating the conduct and `the speech of its employees that differ(s) significantly from those it possesses in connection with regulation of the speech of the citizenry in general,'" it must "arrive at a balance between the interests of the (employee), as a citizen, in commenting upon matters of public concern and the interest of the (government), as an employer, in promoting the efficiency of the public services it performs through its employees." LetterCarriers, 413 U.S. at 564 (quoting Pickering v. Board ofEducation, 391 U.S. 563, 568 (1968)). This must be done on a case-by-case basis. As the burden of the particular statute "comes closer to impairing core first amendment values . . . or impairs some given first amendment value more substantially, . . . the requisite closeness of fit of means and end increases accordingly." Morial v. Judiciary Commission of Louisiana,565 F.2d 295, 300 (5th Cir. 1977). See also Hatten v. Rains,854 F.2d 687, 695 (5th Cir. 1988) (reaffirming standard).
¶ 5 The Morial court addressed a portion of the question posed here. In Morial, the Fifth Circuit upheld a Louisiana statute and canon of judicial conduct[1] which required state judges to resign their offices before becoming candidates for non-judicial office. A sitting judge who resigned to run for mayor of New Orleans challenged the statute on First Amendment grounds.
¶ 6 The Morial court first noted that the Supreme Court has not held the right to candidacy to be fundamental. Id. at 301 (citing Bullock v. Carter, 405 U.S. 134, 142-44
(1972)).[2] Still, a judge wishing to run for another office had to pay a "heavy price" for his decision, a burden which weighed upon the exercise of "an important, if not constitutionally `fundamental,' right." Id. Nonetheless, the court observed the restrictions left unaffected the "core first amendment values" of the right to vote for the candidate of one's choice or the right to make statements regarding one's private opinions on public issues outside a campaign context, nor did the restrictions penalize any person for any particular idea. Id.
The court noted the burden on other voters was even less: excluding judges from being candidates did not exclude candidates of an "identifiable group or viewpoint . . . or minority parties." Id. at 301-02. See also Letter Carriers,413 U.S. at 564 ("The restrictions so far imposed . . . are not aimed at particular parties, groups, or points of view, but apply equally to all partisan activities of the type described. They discriminate against no racial, ethnic, or religious minorities. Nor do they seek to control political opinions or beliefs, or to interfere with or influence anyone's vote at the polls."). After reviewing these factors, the court concluded the impairment of the plaintiff's right to free expression and political association was therefore not sufficiently grievous to trigger a strict scrutiny analysis. Accordingly, the court used "a level of scrutiny which requires the state to show a reasonable necessity" for the requirement. Id. at 302.
¶ 7 The state defended the requirement as "a measure designed to insure the actual and perceived integrity of state judges"; specifically, "to prevent abuse of the judicial office by a judge-candidate during the course of the campaign," "to prevent abuse of the judicial office by judges who have lost their electoral bids and returned to the bench," and "eliminating even the appearance of impropriety by judges both during and after the campaign." Morial at 302. The court noted that the interests were "grave and honorable," adding that the state had "at least as great an interest in assuring the impartiality of judicial administration of the laws as in assuring the impartiality of bureaucratic administration of the laws," id., reasons given for upholding statutes in Letter Carriers. This philosophy was entitled to the "greatest respect" in an era in which judges are called upon to decide cases presenting hotly debated social or political issues. Id. Based on these arguments, the court deemed them reasonably necessary to vindicate the state's interests. Id. at 303. See also Giglio v. Supreme Court ofPennsylvania, 675 F. Supp. 266, 270-71 (M.D. Pa. 1987); Adamsv. Supreme Court of Pennsylvania, 502 F. Supp. 1282, 1292 (M.D. Pa. 1980) (following Morial).
 B. Applicability to Oklahoma
¶ 8 The same arguments apply here. Although the Oklahoma statute does indeed place a heavy burden on a judge who wishes to run for another office, the right to run for office is not a "fundamental right" which triggers strict scrutiny analysis. But because it does exact a heavy toll, the state here would have to prove the restriction was one which is "reasonably necessary." As in Morial, by requiring a judge to resign when he becomes a candidate, the law ensures he will not be in a position to abuse his office by using it to support his candidacy during the campaign. See Morial, 565 F.2d at 303. Likewise, requiring a judge to resign avoids the appearance of impropriety which could be present even if the judge-candidate rendered a decision during the campaign which had no political basis at all. The same is true concerning the prevention of post-campaign abuse or appearance of it, should the judge lose.[3] As the Morial
court observed, "the standard of reasonable necessity does not require the state to place entire reliance" on post-campaign measures such as disciplinary proceedings or strict rules of recusal, even though both of those remedies "are designed to target perfectly those situations where the dangers of abuse or its appearance are greatest." Id. at 303. The reasonable necessity test permits a degree of prophylaxis, especially when the state has a great interest in avoiding the appearance of impropriety. Id. See also Letter Carriers, 413 U.S. at 565 ("it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.").
 II. EQUAL PROTECTION A. Precedent
¶ 9 The Morial court also was confronted with an argument that the statute in question violated the Equal Protection Clause of the Fourteenth Amendment. It began by stating that the level of scrutiny would be the same "reasonably necessary" standard used in analyzing the underlying claim, here alleging a substantive deprivation of the plaintiff's First Amendment rights.[4] See also Craig v. Boren, 429 U.S. 190, 197
(1977) (to be constitutionally permissible, the classification created by the statute must "serve important governmental objectives," and be "substantially related to achievement of those objectives.").
¶ 10 The statute in question in Morial required a judge to resign if he wanted to run for a non-judicial office, but made no such requirement if the judge were running for a judicial office. The court dispensed with the equal protection arguments this scenario posed. However, the court also addressed the question presented here, why the judicial branch of government was treated differently than the other two branches. The court began by noting that the judicial office was "different in key respects" from other offices. Because of this difference, the state may regulate its judges with those differences in mind:
 For example the contours of the judicial function make inappropriate the same kind of particularized pledges of conduct in office that are the very stuff of campaigns for most non-judicial offices. A candidate for the mayoralty can and often should announce his determination to effect some program, to reach a particular result on some question of city policy, or to advance the interests of a particular group. It is expected that his decisions in office may be predetermined by campaign commitment. Not so the candidate for judicial office. He cannot, consistent with the proper exercise of his judicial powers, bind himself to decide particular cases in order to achieve a given programmatic result. Moreover, the judge acts on individual cases and not broad programs. The judge legislates but interstitially; the progress through the law of a particular judge's social and political preferences is, in Mr. Justice Holmes' words, "confined from molar to molecular motions." Southern Pacific Co. v. Jensen, 244 U.S. 205, 221, 37 S. Ct. 524, 531, 61 L. Ed. 1086 (1916) (Holmes, J., dissenting).
Morial, 565 F.2d at 305.
¶ 11 Additionally, a sitting judge might be put in the position of making pledges of post-campaign conduct concerning both issues and personnel, as non-judicial candidates can. Because of this, the state could reasonably conclude that those pledges and promises, even though they were made during a campaign for a non-judicial office, might affect or appear to affect the conduct of a judge who returned to the bench following an electoral defeat. "By requiring resignation of any judge who seeks a non-judicial office and leaving campaign conduct unfettered by the restrictions which would be applicable to a sitting judge, Louisiana has drawn a line which protects the state's interests in judicial integrity without sacrificing the equally important interests in robust campaigns for elective office in the executive or legislative branches of government." Id.
¶ 12 The same analysis applied for differentiating between judges as a group and other office holders as a group regardless of the office being sought.
 A judge who fails in his bid for a post in the state legislature must not use his judgeship to advance the cause of those who supported him in his unsuccessful campaign in the legislature. In contrast, a member of the state legislature who runs for some other office is not expected upon his return to the legislature to abandon his advocacy of the interests which supported him during the course of his unsuccessful campaign. Here, too, Louisiana has drawn a line which rests on the different functions of the judicial and non-judicial office holder.
Id. at 305-06 (footnotes omitted).
 B. Applicability to Oklahoma
¶ 13 The rationale expressed above is even stronger in the case of the Oklahoma statute. Unlike the Louisiana statute, which drew a line between a judge wishing to run for non-judicial office and one wishing to run for a judicial one, the Oklahoma statute makes no such distinction by requiring a judge to resign if he decides to seek any other elected position. Like Louisiana, Oklahoma has a section devoted entirely to the judiciary branch of government in its state Constitution, and a separate title is devoted to the judiciary in the Oklahoma Statutes.
¶ 14 Based on the above arguments, the differences between officials in the judiciary branch and officials in the other branches of government are of sufficient magnitude to show that different treatment is reasonably necessary, and that the classification created by the statute serves important governmental objectives and is substantially related to achievement of those objectives.
¶ 15 Nor is there a constitutional problem with requiring an appointed judge to resign from a non-elected position if the incumbent elected judge seeks to retain her elected position. Although it is true that the threat to professional harmony and discipline would be lessened if the appointed judge seeking the elected position came from a jurisdiction such as a municipal court instead of the county courthouse, see Gray v. StateElection Board, 962 P.2d 1, 3 (Okla. 1998) (Opala, J., concurring in result), there still exists the possibility that the public could be confused by the concept of two sitting judges seeking the same position. This is sufficient to show the resign-to-run requirement of this portion of the statute is reasonably necessary to eliminate this confusion. Cf. Freeman v.State Election Board, 969 P.2d 982 (Okla. 1998) (In examining an election statute requiring a "preliminary declaration of candidacy" if the candidate has a similar name to incumbent, the Court states "confusing the voters" is a valid reason to refute a disqualified candidate's claim his equal protection rights were violated).
 III. PROHIBITIONS AGAINST SEEKING HIGHER OFFICE
¶ 16 As an aside, you ask whether a municipality could pass an ordinance or include contract prohibitions prohibiting its appointed judges from seeking higher elected judicial office that could withstand a constitutional challenge.
¶ 17 As noted above, the Supreme Court has not declared the right to run for public office as a "fundamental" right triggering strict scrutiny. However, there is a basic difference inherent in this question. The state statute does not prohibit a judge from seeking a higher office; it merely places a condition precedent upon him in order to do so. The statute or contractual provision in your scenario would appear to place a flat bar against a person's being able to seek higher elected judicial office, regardless of the person's status as a judge. Under the "sliding scale" analysis used in Morial, this would appear closer to core First Amendment values: instead of constituting only a "deterrent by way of inconvenience," Hatten at 695 (discussing a requirement to submit financial disclosure statements as a precondition to candidacy), this comes closer to presenting an actual "bar to political participation," id.,
which would necessitate an increasing "closeness of fit" between the restriction and the rationale behind the restriction.Morial, 565 F.2d at 300.
¶ 18 On the other hand, one could interpret such a statute as placing the prohibition upon the person while that person is ajudge. Cf. Oklahoma State Election Board v. Coats,610 P.2d 776, 780 (Okla. 1980) (Prohibition against a district attorney running for another office whose term would overlap the district attorney's. Statute attached an impediment to the office, not to the officeholder). Depending upon the wording, the person could run for higher judicial office if he were first to resign his judicial position. In such a situation, the analysis set forth above would be applicable here. The municipal ordinance would be useless, as it would be superseded by the state restriction which is the subject of your question.
¶ 19 In short, the answer to your question would depend on the wording of the municipal ordinance. As that particular question is fact-specific, it is outside the scope of an Attorney General Opinion.
 IV. CONCLUSION
¶ 20 The above discussion is not designed to be all-inclusive, nor is it intended to imply that any or all judicial officers in the State of Oklahoma would abuse their positions in order to be elected to a different office. Rather, it is intended solely to reply to the assertions that the statute in question is unconstitutional. As was stated at the beginning of this Opinion, a legislative act is presumed to be constitutional and will be upheld unless it is "clearly, palpably and plainly inconsistent with the Constitution." Reherman, 679 P.2d at 1300. Acts of the Legislature are constitutionally valid "unless they are shown beyond a reasonable doubt to violate the Constitution."Bethany, 904 P.2d at 613. Therefore, the discussion set forth above is intended to show that arguments against the constitutionality of the statute do not beyond a reasonable doubt rebut the presumption of constitutionality. Nor is the discussion intended to question the wisdom of the Legislature in enacting the provision being questioned. As the United States Supreme Court observed, "[p]erhaps [the Legislature] at some time will come to a different view of the realities of political life and Government service; but that is its current view of the matter, and we are not now in any position to dispute it. Nor, in our view, does the Constitution forbid it." Letter Carriers,413 U.S. at 567.
¶ 21 It is, therefore, the official Opinion of the AttorneyGeneral that:
Title 20 O.S. Supp. 1998, § 1404[20-1404] mandating that a judicialofficer must vacate his office when he becomes a candidate forany nonjudicial or judicial office, does not violate the FirstAmendment or the Equal Protection Clause of the FourteenthAmendment to the Constitution of the United States of America.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
DAN CONNALLY ASSISTANT ATTORNEY GENERAL
[1] You did not inquire as to the constitutionality of Canon 5(A)(2) of the Code of Judicial Conduct, codified at 5 O.S. Supp. 1998, Chapter 1, Appendix 4, which states that a judge "should resign from judicial office upon becoming a candidate for a non-judicial office either in a primary or a general election." However, the rationale in the following discussion would also dispose of an argument that this Canon is unconstitutional.
[2] See also Clements v. Fashing, 457 U.S. 957, 963 (1982) (plurality) (quoting Bullock v. Carter, 405 U.S. 134, 143
(1972)) ("Far from recognizing candidacy as a `fundamental right,'" the Court has "held that the existence of barriers to a candidate's access to the ballot `does not itself compel close scrutiny.'").
[3] You also mention the possibility of a leave of absence. It is because of the possibility of post-election office abuse that this option is not viable. Even if the judge is not adjudicating cases during a particularly hard-fought campaign, there is always the specter which could arise if he returns to his courtroom and encounters a supporter of his victorious opponent, or perhaps the opponent himself. Requiring a resignation appears to be the least restrictive means to achieve the statute's ends.
[4] See Morial, 565 F.2d at 304:
 While it is true that a first amendment claim typically takes the form of an assertion that the government cannot deprive the plaintiff of some freedom and an equal protection claim takes the form of an assertion that the government may not single out the class of which the plaintiff is a member for deprivation, it is equally true that every first amendment claim can be transformed into an equal protection claim merely by focusing upon the classification that every legislative scheme embodies. It is, therefore, generally appropriate to employ the same standard of scrutiny to the derivative equal protection claim as would be applied to the underlying claim of a substantive deprivation. The method of equal protection analysis, however, retains independent worth even in such cases. Highlighting the legislative classification serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest. (Citations omitted.)
In a footnote, the court observed that, if the legislative scheme embodied a classification which was itself constitutionally suspect, strict scrutiny would be required regardless of the nature of the underlying deprivation. Id. At 304 n. 9.