[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 3, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-16256

_____

D. C. Docket No. 02-80555-CV-JAL

KENNETH EGGLESTON,

Plaintiff-Appellant,

versus

ED BIELUCH, Former Sheriff,
individually,
RIC BRADSHAW, in his
official capacity as Sheriff
of Palm Beach County,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 3, 2006)

Before TJOFLAT, CARNES and HILL, Circuit Judges.

CARNES, Circuit Judge:

Kenneth Eggleston appeals the summary judgment entered against him in the lawsuit he brought against Ed Bieluch, the former sheriff of Palm Beach County, Florida.[1] The court found that by terminating Eggleston's employment with the Sheriff's Office, Bieluch had violated neither Eggleston's equal protection rights nor his First Amendment rights.

## I.

On September 1, 1989, Eggleston was hired by the Sheriff's Office as a deputy in the road patrol division. In that position, Eggleston was at the bottom of the command structure. From highest to lowest rank, the structure is: sheriff, undersheriff, colonel, major, captain, lieutenant, sergeant, corporal, deputy sheriff.

Off and on over the next decade, Eggleston worked under the supervision of Bieluch while Bieluch was a sergeant and then lieutenant. The two men had a close working relationship and held each other in high regard. Bieluch personally signed off on Eggleston's yearly evaluations from 1993 to 1995. In each of those

[1] In February 2005, Ric Bradshaw was substituted as a party pursuant to Federal Rule of Civil Procedure 26(d)(1), which provides for automatic substitution when a public officer who is a party to an action in an official capacity is succeeded in office during the pendency of the action. Although there are both individual and official capacity claims raised in this appeal, for ease of reference we will refer to the defendant as Bieluch throughout this opinion.

evaluations, Bieluch agreed with the reviewer's finding that Eggleston either met or exceeded expectations or was outstanding in all categories. Eggleston was promoted to sergeant in 1995.

In 1996, Bieluch asked Eggleston to help an associate of theirs in his campaign for sheriff of Palm Beach County, and Eggleston agreed. During the course of that campaign, Eggleston and Bieluch "were together all the time," raising money and organizing campaign functions. Eggleston, who had never before participated in a political campaign, considered Bieluch a "mentor" and a friend.

The two remained close after Eggleston resigned, for reasons not related to this lawsuit, from the Sheriff's Office in September 1999 at the rank of sergeant. Bieluch, then a captain, asked for Eggleston's assistance in his own campaign for sheriff during the November 2000 election. Eggleston managed Bieluch's campaign, handling his meetings, television appearances and mailings. Eggleston claims that the two had an understanding that if the campaign was successful, Bieluch would appoint him undersheriff and groom him to be the next sheriff of Palm Beach County. He claims that Bieluch told him that he planned to retire after only one term.

Things initially went as planned. After winning the election, Bieluch asked the incumbent sheriff to hire Eggleston during the transition of administrations. Eggleston returned to the sheriff's office as a captain in December 2000. After taking office in January 2001, Bieluch promoted Eggleston to the rank of undersheriff. As undersheriff, Eggleston was second-in-command, responsible for the day-to-day administration of the department and running it when Bieluch was absent. Because undersheriff is a political position which carries no protection under the Career Services Act, Eggleston could be removed from office at any time in Bieluch's sole discretion.

In July or August of 2001, at a meeting of the Command Staff, Bieluch announced that he planned to seek a second term as sheriff. Eggleston conceded that he was "shocked" by Bieluch's change of plans and by his failure to speak with Eggleston privately about the decision before formally announcing it. Eggleston nonetheless insisted in his deposition that he "accepted it and moved on." He said that "[a]t worst" Bieluch's decision "would have delayed [his] ability to run for sheriff," but it "didn't change [his] day-to-day working relationship with [Bieluch]."

It was around this time that Eggleston and Bieluch's relationship began to sour. In the fall of 2001 Eggleston began to voice his disagreement with Bieluch's

4

administration of the department, expressing his feelings both in private meetings with Bieluch and during Command Staff meetings.[2]

Eggleston criticized four aspects of Bieluch's administration. First, he questioned Bieluch's personnel decisions, telling Bieluch that promotions should not be awarded in the absence of exams or other uniform guidelines; pay grade changes should be reviewed because they were affecting morale; and unqualified individuals should not have been hired or appointed to certain positions. Second, Eggleston criticized Bieluch's decision to make officers serving at the Eagle Youth Academy eligible for the state's high-risk pension plan. Third, Eggleston challenged Bieluch's handling of the department's budget. He objected to the purchase of certain expensive items, including a helicopter and mobile command vehicle. He also questioned both Bieluch's use of sole sourcing and his alleged failure to fulfill his campaign promise to provide quarterly budget deficit updates. Fourth, Eggleston opposed Bieluch's expansion of take-home car privileges to include more civilians and corrections personnel.

Eggleston testified in his deposition that after he made his feelings known, Bieluch "beg[a]n to cut [him] out of the loop." In the fall of 2001, Bieluch started

---

[2] There is some evidence in the record that Eggleston had expressed concerns with Bieluch's hiring decisions and failure to keep his campaign promises as early as December 2000, even before he was actually promoted to undersheriff.

5

to exclude Eggleston from meetings regarding department spending and the classification of the employees at the Eagle Youth Academy.

In December of 2001, Eggleston was recruited by the Democratic Congressional Campaign Committee in Washington, D.C. to run for Congress against Representative Mark Foley, a Republican. In December and January, local newspapers ran articles about Eggleston's potential congressional bid and the possibility that he might run for sheriff against Bieluch if his congressional campaign proved unsuccessful. Eggleston and Bieluch dispute whether they ever actually discussed the articles. Eggleston claims that a "tension" and "coldness" developed in his relationship with Bieluch, and although it was "very bothersome," it did not dissuade him from running. Bieluch does not recall discussing the articles with Eggleston. In any event, Eggleston formally launched his congressional campaign in late January.

On February 1, 2002, Bieluch asked for Eggleston's resignation as undersheriff, explaining that he had lost confidence in him. Eggleston argued against Bieluch's decision and asked Bieluch to reassign him to be a captain serving as District Commander over the congressional district in which he was seeking election. Bieluch eventually agreed to do that. Eggleston concedes that Bieluch warned him that he could not use his office phone or pager for campaign

6

purposes. Additionally, Eggleston concedes that Bieluch informed him that he would have to either take a leave of absence or resign from the sheriff's office if he qualified to run for Congress. Bieluch claims that he also told Eggleston that he could not campaign on duty or while in uniform and could not use his official vehicle to travel to political events, but Eggleston denies that there were any such orders.

Bieluch and Eggleston also discussed the issue of "flex-time," a practice where all members of the executive staff, including captains, track the overtime hours worked and use those hours for personal business during a workday, while still being considered "on duty" for pay purposes. None of the written policies or procedures of the department addressed the issue of flex-time. Bieluch explicitly told Eggleston that flex-time did not exist, but Eggleston asserted that "it's always existed" and that he had accumulated 400 hours of flex-time as undersheriff. Bieluch says that he "specifically told [Eggleston] he could not use flex-time" for campaigning. Eggleston says that no direct order was given. Eggleston did concede in his deposition that Bieluch informed him that his previously accumulated flex-time hours no longer existed, and that, even if the use of flex-time had been permitted in the past, Bieluch, as sheriff, had the right to change the practice at will.

The issue of flex-time again came up in March 2002, at a Command Staff meeting. Undersheriff William Tremer informed Eggleston and other executive staff members that "[t]he sheriff has stated that flex-time does not exist." The minutes of the meeting specifically recite that employees are no longer allowed to accrue and bank flex-time. Additionally, Tremer announced that flex-time could only be used at the discretion of a supervising officer. Eggleston, however, insisted in his deposition that following the meeting, the issue "wasn't resolved" and that "[t]here wasn't an absolute order given."

Regardless of Bieluch's position on the subject, Eggleston continued to use flex-time to campaign for Congress. On March 26, 2002, he attended a political lunch meeting with a representative of the Sugar Cane Growers Cooperative of Florida in West Palm Beach. He wore his official uniform to the meeting, but the record is unclear as to whether he drove his patrol car. Eggleston insisted that he was using flex-time, but he admitted that he did not receive authorization from a major as required by Tremer's March 5, 2002 order. The meeting lasted from 12:30 p.m. until 2:00 p.m.

On April 10, 2002, Eggleston traveled about fifty miles to St. Lucie County to meet with the local sheriff for a campaign event. Eggleston again wore his uniform, and he drove his patrol car to the meeting. He claimed that he used flex-

8

time for the trip and that he had notified his executive officer, Lieutenant Hart, that he was taking a flex-day. Bieluch asserts that Eggleston was on duty and took the trip in direct violation of both department policies and Bieluch's orders. Within a few days of the event, articles appeared in a local newspaper questioning whether it was appropriate for Eggleston to campaign during working hours.

On April 16, 2002, Bieluch placed Eggleston on administrative leave with pay and ordered a formal internal investigation into Eggleston's campaign activities. He instructed Eggleston not to leave his house between 8 a.m. and 4 p.m., not to represent himself as an officer, and not to wear his uniform. Eggleston was stripped of his official identification and patrol car and no longer allowed to act in any official capacity. That same day, Eggleston gave a televised speech, telling reporters that he had been suspended from the department, when, in fact, he had been placed on paid administrative leave. In his televised remarks, Eggleston also openly criticized the department and Bieluch's decisions as sheriff.

Upon conclusion of the investigation on May 7, 2002, Eggleston was charged with violating departmental regulations and policies through his (1) insubordination in failing to comply with a direct order of a superior; (2) improper political activity; and (3) insubordination in criticizing Bieluch's orders and policies. The first and second violations were based on Eggleston's daytime

9

meetings with the Sugar Cane Growers representative and the St. Lucie County sheriff.  The third violation was based on the televised speech Eggleston gave after being placed on administrative leave.  Bieluch terminated Eggleston on May 8, 2002.

After his termination from the department, Eggleston was quoted in a June 14, 2002 newspaper article as saying:  "I was vocal and consistent in my opposition with the sheriff. . . .  Because of this, our relationship soured, and I knew that our ability to work together was irrevocably breached."  The article also reported Eggleston's June 13th announcement that he was withdrawing from the congressional race and suing Bieluch "for unlawful firing and destroying his political campaign."

## II.

Eggleston filed this lawsuit on June 13, 2002 as a 42 U.S.C. § 1983 action against Bieluch in his individual and official capacities, asserting violations of his Fourteenth Amendment right to equal protection, Fourteenth Amendment right to procedural due process, and First Amendment rights to free speech and to run for political office.

## A.

On July 10, 2002, Bieluch moved to dismiss all three claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. He also moved to dismiss the claims against him in his individual capacity on qualified immunity grounds. Bieluch responded to the equal protection claim by characterizing it as a restatement of the First Amendment claim and by arguing that Eggleston had not identified a similarly situated individual who was treated differently than himself. He responded to the procedural due process claim by denying that Eggleston possessed a property right in his employment. With regard to the First Amendment claim, Bieluch argued that: (1) Eggleston's speech claim was not based on a matter of public concern and for that reason was not entitled to protection under the First Amendment; (2) any restrictions placed upon Eggleston's speech or activities were proper in light of the operational needs of a law enforcement agency and the importance of avoiding disruption in the department; and (3) any restrictions placed upon Eggleston's campaign activities were reasonable and lawful.

In an order entered on March 5, 2003, the district court denied Bieluch's motion to dismiss, concluding that Eggleston's complaint stated causes of action and that Bieluch's motion, "for the most part, assert[ed] defenses which [could not]

be considered on a motion to dismiss."  Bieluch brought an interlocutory appeal to this Court.

In an unpublished opinion we affirmed in part and reversed in part.  First, we concluded that the complaint's allegations, taken as a whole, could be read to sufficiently state an equal protection violation, and that Bieluch was not entitled to qualified immunity on the equal protection claim.

Second, we concluded that Eggleston had failed to state a claim under the due process clause because he possessed adequate remedies at state law.  Because Eggleston's allegations failed to state a violation of due process, we did not need to consider whether that right was clearly established.  We held that Bieluch was eligible for qualified immunity on the due process claim and we reversed the district court's denial of Bieluch's motion to dismiss to that extent.

Third, we considered Eggleston's allegation that Bieluch, in his individual capacity, violated Eggleston's First Amendment right to participate in a political campaign.[3]  We held that because "there [was] no clearly established law that the restrictions Bieluch placed on Eggleston's candidacy violated his constitutional

---

[3]  We declined to consider Eggleston's claim that "Bieluch's filing of an Internal Affairs complaint against Eggleston . . . violated his rights to free speech and to run for political office guaranteed by the First Amendment . . . ."  We noted that in his brief to this Court, Eggleston had conceded that his right was not clearly established and had withdrawn this claim against Bieluch in his individual capacity.

rights," Bieluch was entitled to qualified immunity on that claim. Based on that determination, we reversed the district court's denial of Bieluch's motion to dismiss Eggleston's First Amendment claims against Bieluch in his individual capacity. The net effect of the first appeal was that Eggleston's lawsuit was allowed to proceed as to the equal protection claim against Bieluch and as to the First Amendment claims against Bieluch in his official capacity only.

## B.

On May 26, 2005, Bieluch, in his individual capacity, and Ric Bradshaw, in his official capacity as the new sheriff of Palm Beach County, filed a joint motion for summary judgment as to both claims. On June 21, 2005, Eggleston filed a motion for partial summary judgment as to the equal protection claim. The district court entered an order on October 7, 2005, granting the defendants' motion for summary judgment and denying Eggleston's motion. Eggleston filed a timely notice of appeal.

## III.

We review de novo the district court's grant of summary judgment, "appraising all facts and reasonable inferences in the light most favorable to the nonmoving party." Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1283 (11th Cir. 2003). Summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A. Equal Protection Claim

Eggleston contends that Bieluch violated his right to equal protection by disciplining him more severely than other employees. Specifically, he contends that Bieluch punished him for: (1) campaigning in uniform, (2) campaigning on duty while claiming to be using flex-time, (3) using his take-home car for campaigning, and (4) publicly criticizing the department and Bieluch's decisions as sheriff. Eggleston claims that Bieluch unfairly demoted him to captain, placed him on administrative leave, and ultimately terminated him. In support of his claim, Eggleston offers examples of other officers who engaged in similar or what he views as more egregious conduct and yet were not disciplined at all or were disciplined less severely than he was.

The district court stated that pursuant to the prior decision of this Court, Eggleston could "prove his equal protection claim either (1) by establishing that similarly-situated individuals were treated differently without a rational basis for

14

the difference in treatment, or (2) by demonstrating that he violated no policy but was nonetheless subjected to harsher discipline than other employees."[4]

Assuming without deciding that the "class of one" theory articulated in Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073 (2000) (per curiam), applies in the public employment context, Eggleston must show that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[5] Id. at 564, 120 S. Ct. at 1074. He must show a satisfactory comparator who was in fact similarly situated and yet treated differently. Comparators must be "similarly situated in all relevant respects," Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir.

---

[4] We recognize that our prior opinion stated: "arbitrarily and vindictively firing Eggleston for campaign activities while imposing no discipline on others who engaged in similar political events, and imposing less severe discipline on thieves and drunk drivers and those who engaged in sexual misconduct—was in violation of this clear constitutional right."
This language could be construed to accept the theory that an equal protection violation occurs if a plaintiff does not violate a policy and is disciplined while others who engaged in misconduct are treated more leniently. We question the legal correctness of such a theory, but we will accept it for our present purposes as part of the law of the case. We note that because our prior opinion is unpublished, neither that nor any other part of it establishes law of the circuit.

[5] We do recognize that there was some confusion in the law of this circuit about the degree of similarity necessary for a valid comparator, but that confusion was cleared up in Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 n.2 (11th Cir. 2006), where we explained that an earlier panel decision prevails over a conflicting later panel decision. Therefore, the "nearly identical" standard set out in Maniccia v. Brown, 171 F.3d 1364, 1368–69 (11th Cir. 1999), is the law of the circuit.

2003) (internal citations omitted), and the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368–69 (11th Cir. 1999). Although determining whether individuals are similarly situated is generally a factual issue for the jury, where there is no genuine issue of material fact that such a comparator does not exists, summary judgment is appropriate. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

We recognize that our prior opinion in this case gave Eggleston some reason to believe that he can make out a viable equal protection claim merely by showing that another officer engaged in "similar political events" and was treated more favorably. That is simply not the law. As the district court determined, Eggleston must show a comparator who both engaged in similar political events and publicly criticized Bieluch and his policies. To the extent our prior decision suggested otherwise, it is clearly erroneous and for that reason not binding under the "law of the case" doctrine. United States v. Escobar-Urrego, 110 F.3d 1556, 1561 (11th Cir. 1997). Under circuit law a valid comparator must be "nearly identical."

16

For Eggleston to prevail on his claim here, he must point to a similarly ranked Palm Beach County officer who both campaigned during the work day while in uniform and publicly criticized Bieluch and the department. Eggleston has not done that. He offered as comparators six officers who engaged in political conduct and a single officer who criticized department polices and Bieluch, but none that did both. Eggleston cannot cobble together a comparator using multiple officers. He must show a single, similarly situated individual who was treated differently. Maniccia, 171 F.3d at 1368–69. He cannot make the necessary showing, and his claim fails.

As a second theory supporting his equal protection claim, Eggleston contends that Bieluch was more lenient with employees who committed more serious offenses while Eggleston did nothing wrong. To support his claim, Eggleston names a number of officers whom he alleges engaged in a wide variety of misconduct and were disciplined less harshly than he was. Nonetheless, Eggleston cannot prevail under this theory either, because it is clear that he violated department policy by openly criticizing Bieluch and the department in a press conference on April 16, 2002. The district court found that this public criticism "subject[ed] the Office to ridicule and undermin[ed] its effectiveness." Eggleston freely admitted to giving that speech, and the department investigation

17

concluded that his conduct constituted insubordination in violation of department policy. Thus, Eggleston failed to show that he violated no policy and therefore, cannot establish a viable claim. The district court's grant of summary judgment in favor of Bieluch as to Eggleston's equal protection claims was proper.

## B. First Amendment Claims

Eggleston presses two First Amendment claims in this appeal. First, he contends that Bieluch's termination of him violated his First Amendment free speech rights. He argues that his speech involved matters of public concern and caused no disruption in the department. The speech in question occurred in private discussions with Bieluch and in Command Staff meetings while Eggleston served as undersheriff. Eggleston criticized four aspects of Bieluch's administration: his personnel decisions, his reclassification of the officers at the Eagle Youth Academy, his budget allocations, and his decision to increase the number of positions entitled to take-home car privileges. Eggleston argues that we must look at his rank at termination (captain) and not his rank when the comments were actually made (undersheriff). He asserts that his criticisms neither caused disruption in the department nor suggested disloyalty to Bieluch.

We analyze Eggleston's speech claim in accordance with the four-part test articulated in Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731

18

(1968).  In considering whether particular speech is protected, we must: (1) determine whether the employee's speech involves a matter of public concern; and if so, (2) weigh the employee's First Amendment rights against the employer's interest in efficient public services; then, (3) decide if the speech in question played a substantial role in the employer's decision; and finally, (4) if the employee shows that the speech did substantially motivate the employment decision, allow the defendant an opportunity to establish that it would have taken the same action in the absence of the speech.  Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993).

Our first inquiry is whether Eggleston's speech addressed a "public concern."  The Supreme Court has defined speech addressing a public concern as "relating to any matter of political, social, or other concern to the community." Connick v. Meyers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983).  In our assessment, we must consider "the content, form and context of a given statement, as revealed by the whole record."  Morgan, 6 F.3d at 754 (quoting Deremo v. Watkins, 939 F.2d 908, 910 (11th Cir. 1991)).  "A court may consider the employee's attempts to make the concerns public, along with 'the employee's motivation in speaking.'"  Id. (quoting Deremo, 939 F.2d at 911).  Speech is more likely entitled to protection when it is made part of a public dialogue.  See Perry v. Sindermann, 408 U.S. 593, 598, 92 S. Ct. 2694, 2698 (1972).  Additionally, speech

19

is more likely to be protected when it is made by an individual speaking out as a citizen rather than in his capacity as an employee. See Connick, 461 U.S. at 147, 103 S. Ct. at 1690; Morris v. Crow, 142 F.3d 1379, 1382 (11th Cir. 1998).

The speech must be about a matter of public concern for First Amendment protections to attach. That requirement is not met here. Eggleston was not trying to expose any illegal conduct or corruption committed by Bieluch or other officers within the department. He was instead acting in his role as undersheriff and carrying out his duty to advise Bieluch. All his concerns were expressed internally at staff meetings. Although it is not necessary that speech be given in a public forum to merit protection, the fact that the speech was given to a "limited audience" weighs against protection in the balancing process. Anderson v. Burke County, Ga., 239 F.3d 1216, 1221 (11th Cir. 2001). There is no evidence that Eggleston was trying to initiate public discourse or educate the electorate on the practices of the department. He was acting as an employee, not as a citizen.

The four areas of criticism voiced by Eggleston show that his speech was not on matters of public concern. First, he challenged Bieluch's personnel decisions, arguing that exams and other guidelines should be utilized to determine promotions and that unqualified employees were being hired. We have held that personnel decisions are basic employment issues that do not constitute matters of public

20

concern. Id. at 1220. The issues Eggleston raised dealt solely with internal office dynamics, not matters of general public importance. Second, Eggleston criticized Bieluch's reclassification of the officers at the Eagle Youth Academy, which entitled them to high-risk pension benefits. We have already held that things such as pension benefits relate to employment issues and are not matters of public concern. Id. Eggleston was not suggesting that Bieluch had acted illegally, he simply took issue with Bieluch's policy determinations about an internal employment matter.

Third, Eggleston criticized Bieluch's budget allocations, specifically his decision to purchase several large-ticket items, his failure to offer quarterly budget deficit updates, and his practice of sole sourcing. We have held that when budget allocations detrimentally affect public safety, a matter of public concern may exist. Martinez v. City of Opa-Locka, Fla., 971 F.2d 708, 712 (11th Cir. 1992). In the Martinez case, however, the protected speech occurred in a public forum before the city's Board of Inquiry after an official had violated a city ordinance by failing to follow budget allocation procedures. Id. Here, Eggleston admits that the actions of Bieluch that he criticized were not illegal. Furthermore, Eggleston was not challenging the expenditures out of a concern for their effect on public safety, but because he thought there were better uses for the money. Eggleston was not

21

seeking a public discussion on department spending, he was simply speaking in house in his advisory role as undersheriff. All the budgetary concerns raised by Eggleston were more matters of internal policy than matters of public concern. Finally, Eggleston condemned Bieluch's decision to extend take-home car privileges to additional department officials. This, too, is an internal employment issue.

In summary, with his speech Eggleston only challenged general employment policies and decisions of an internal nature. He expressed his criticisms in his professional role as undersheriff, not as a concerned citizen. It is irrelevant that Eggleston's termination occurred while he was a captain, because he was serving as undersheriff at the time the comments in question were made. He voiced all of his criticisms internally at staff meetings, and there is no indication that he was attempting to initiate public debate concerning the department's policies or Bieluch's conduct as sheriff. Because none of the speech Eggleston offers in support of his First Amendment free speech claim involves a matter of public concern, we need not address the other elements of the claim.

Eggleston's other First Amendment claim is that Bieluch violated his constitutional rights by limiting his ability to campaign during the internal investigation, which was conducted from April 16, 2002 through May 7, 2002.

During that time, Eggleston was instructed to remain in his home during work hours, refrain from wearing his uniform, and stop representing himself as a sheriff's office employee. Both his patrol car and his official identification were taken.

The district court characterized Eggleston's claim as an "attempt[] to argue that Bieluch placed restrictions on [his] campaign activities because Bieluch and Eggleston are members of different factions of the Democratic party." It rejected the attempt as "both legally and factually insufficient to overcome summary judgment." On appeal, Eggleston contends that the district court misconstrued his argument and neglected to address his arbitrary treatment "campaign" claim separate from his failed intra-party discrimination "political" claim. Eggleston does not appeal his "political" claim, but he does assert that he has a valid "campaign" claim based on arbitrary treatment. We disagree. Eggleston cannot show that Bieluch unconstitutionally restricted his ability to campaign during the investigation.

The Supreme Court held in Clements v. Fashing, 457 U.S. 957, 963, 102 S. Ct. 2836, 2843 (1982), that the right to campaign is not fundamental and does not merit strict scrutiny analysis. Further, the Court held: "In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of

23

their impact on voters." Id. (quoting Bullock v. Carter, 405 U.S. 134, 143, 92 S. Ct. 849, 855 (1972)). Specifically, the Court determined that it was reasonable to require those holding certain state offices to resign from their current position before seeking another political office. Id. at 970–71, 102 S. Ct. at 2847–48. A state has a legitimate interest in making sure a government official "will neither abuse his position nor neglect his duties because of his aspirations for higher office. The demands of a political campaign may tempt a[n] [officer] to devote less than his full time and energies to the responsibilities of his office." Id. at 968, 102 S. Ct. at 2846.

While we agree that Eggleston has a right to campaign free from irrational obstacles, the limitations imposed by Bieluch while Eggleston was being investigated were not irrational. It was not unreasonable to limit Eggleston's campaign conduct during work hours and to restrict his ability to represent himself as a Palm Beach County captain, using the emblems of that office while campaigning. Those restrictions were even more reasonable considering that the department was in the process of investigating Eggleston's prior campaign activities to ensure that he had not violated department policies. The limitations, which were of twenty-one days duration, were neither arbitrary nor vindictive and there is no evidence indicating that they were motivated by Eggleston's political

24

affiliation.  As a result, the district court did not err in entering summary judgment against Eggleston on this claim.

**AFFIRMED.**